**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                                :
MACDERMID PRINTING SOLUTIONS,   :   CIVIL ACTION NO. 07-4325 (MLC)
L.L.C.,                         :
                                :       MEMORANDUM OPINION
        Plaintiff,              :
                                :
        v.                      :
                                :
E.I. DU PONT DE NEMOURS AND     :
COMPANY,                        :
                                :
        Defendant.              :
_____:
```

**COOPER, District Judge**

Plaintiff, MacDermid Printing Solutions, L.L.C. ("MacDermid"), brings this action against Defendant, E.I. du Pont de Nemours and Company ("DuPont"), alleging that DuPont has infringed, has induced others to infringe, and/or will induce others to infringe claims in United States Patent No. RE39,835 ("'835 Reissue Patent"). (Dkt. entry no. 1, Compl.) MacDermid specifically asserts claims 13-18, 24-27, and 30-31 of the '835 Reissue Patent ("Asserted Claims"). (Dkt. entry no. 142-2, Def. Statement of Undisputed Facts ("SOF") at ¶ 7; dkt. entry no. 147-4, Response to SOF at ¶ 7.)[1]

DuPont now moves for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56, arguing that the Asserted

---

[1] MacDermid originally asserted claims 1-3, 13-18, 24-28, and 30-31, but withdrew claims 1-3 and 28 after the Court issued its Memorandum Opinion and Order relating to claim construction. (See SOF at ¶ 7; Response to SOF at ¶ 7; see also dkt. entry no. 97, Markman Opinion & Order.)

Claims are invalid pursuant to 35 U.S.C. § 251 and the rule against recapture.  (Dkt. entry no. 142, Mot.)  The parties appeared for oral argument on April 18, 2012.  The Court, upon consideration of the parties' written submissions and argument and for the reasons set forth below, will deny the motion.

**BACKGROUND**

**I.   The Technology**

The '835 Reissue Patent, entitled "UV-Absorbing Support Layers and Flexographic Printing Elements Comprising the Same", is a reissue of U.S. Patent No. 6,413,699 ("'699 Patent" and, together with the '835 Reissue Patent, "Patents").  Both Patents purport to address "a need . . . for an improved method to produce direct-imaged capped and uncapped flexographic printing plates" and provide that the field of the invention:

> is directed to flexographic printing elements
> having light-attenuating support layers, to the
> formation of relief images on direct-image flexographic
> printing elements and, more particularly, to methods
> for achieving a uniform floor in the manufacture of
> such direct-imagine flexographic printing elements.

(Dkt. entry no. 142-3, Ricciardi Decl., Ex. A, '835 Reissue Patent at col. 1, lines 12-17, col. 3, line 13-15; Ricciardi Decl., Ex. B., '699 Patent at col. 1, lines 7-12, col. 3, lines 7-9.)

Both Patents state:

> In the art of flexographic printing, processes
> have been developed to eliminate the use of the

2

> negative, thereby offering significant advantages over
> previous methods such as, for example, cost efficiency,
> environmental impact, convenience, and image quality.
> Many such processes are referred to as direct-to-plate
> (DTP) processes.

('835 Reissue Patent at col. 1, lines 45-50; '699 Patent at col.
1, lines 40-45.)  The Patents then detail how DTP technology
differs from conventional plate-making technology, in several
respects.  (See, e.g., '835 Reissue Patent at col. 2, lines 1-9;
'699 Patent at col. 1, line 63 through col. 2, line 4.)

> DTP plates, for example, typically have a photoablative
> mask directly on the plate.  Also, in DTP technology,
> face exposure, i.e., a blanket exposure to actinic
> radiation of the photopolymerizable layer on the side
> that does (or, ultimately will) bear the relief, is
> done in air (in the presence of oxygen), whereas, with
> conventional plates, exposure is typically done in a
> vacuum.
>      Because face exposure is conducted in the presence
> of oxygen, there is the potential for excessive
> exposure of the photocurable layer to oxygen in areas
> where the masking layer has been removed.  This can
> present problems because the photopolymerization
> kinetics of many materials in the presence of oxygen
> are very different from those observed in the absence
> of oxygen because oxygen is a known free radical
> scavenger.  Hence, oxygen has the effect of inhibiting
> polymerization of the photocurable material, thus
> requiring longer exposure times.  In addition, oxygen
> could potentially act as a UV screening agent,
> resulting in attenuation of the actinic radiation.
> Generally, this phenomenon is referred to as "oxygen
> inhibition."

('835 Reissue Patent at col. 2, lines 1-22; '699 Patent at col.
1, line 63 through col. 2, line 17.)

3

The invention thus purports, <u>inter alia</u>, to solve the problems typically associated with oxygen inhibition.

> To decrease front exposure times when processing printing elements with DTP technology such that such times are comparable to those of conventional printing elements, the photo speed (i.e., the speed of photopolymerization) typically is increased to counter the effects of oxygen inhibition.  One way to do this is to incorporate oxygen scavengers such as, for example, triphenylphosphine and triphenylphosphite, into the polymer formulation.  The addition of oxygen scavenger to the polymer formulation, however, not only decreases the front exposure time, but, also decreases the back exposure time as well. . . .
> Preferably, the oxygen scavenger is a phosphine compound.  Representative phosphine compounds include triphenylphosphine, tri-p-tolylphosphine, [and others].  Triphenylphosphine is particularly preferred.
> . . . Additional ways to decrease the exposure times include increasing the intensity of the actinic radiation.  High intensity lamps, however, typically generate heat which can create problems such as plate warping and image deterioration.

('835 Reissue Patent at col. 2, lines 44-54, col. 5 at lines 50-54; '699 Patent at col. 1, line 39-46, col. 5 at lines 45-49.)

The motion, and the parties' arguments thereon, relate to the exclusion of an "oxygen scavenger" limitation in the Asserted Claims.

## II.  Patent Prosecution History

### A.  The '699 Patent

MacDermid filed its original patent application, which contained twenty-three claims, with the United States Patent and Trademark Office ("PTO") on October 11, 1999.  (Dkt. entry no.

4

147-5, Pl. Supp. Statement of Undisputed Facts ("Supp. SOF") at

¶ 14; dkt. entry no. 151-1, Def. Response to Supp. SOF at ¶ 14.)[2]

The PTO assigned it United States Patent Application No.

09/415,811 ("'811 Application"). (Dkt. entry no. 147-2, Picanso

Decl., Ex. A, '811 Application; Supp SOF at ¶ 14; Response to

Supp. SOF at ¶ 14.)[3]  Each of the twenty-three claims in the '811

Application included an oxygen scavenger limitation.  ('811

Application at Claims 1-23.)

   The PTO examiner ("examiner") issued the first Office Action

upon the '811 Application on October 2, 2000, rejecting claims

1-8 and 10-23 under 35 U.S.C. § 103(a) as obvious.  (Picanso

Decl., Ex. B, 10-2-00 Office Action.)[4]  The examiner's bases for

this rejection are immaterial to the Court's resolution of the

motion and, accordingly, we will not recite them.[5]

---

[2] "Individuals, not corporations, create inventions[.]"
MBO Labs., Inc. v. Bectin, Dickinson & Co., 602 F.3d 1306, 1310
n.1 (Fed. Cir. 2010).  The Court will, for simplicity's sake,
nonetheless refer to MacDermid as the patentee in this matter.

[3] The Picanso Declaration exhibits appear at docket entry
nos. 147-2 and 147-3.

[4] The parties agree that the examiner objected to claim 9 as
being dependent upon a rejected claim, and rejected claim 23.
(Supp. SOF at ¶ 15; Response to Supp. SOF at ¶ 15.)  The Court
notes, however, that the examiner did not explicitly reject or
object to claim 23 in the 10-2-00 Office Action.

[5] We note, however, that the examiner found that: (1) the
prior art taught the use of triphenylphosphine; and (2) tri-
phenylphosphine met the proposed claims' invention's limitation
for an oxygen scavenger.  (Id. at 2-3.)

MacDermid thereafter filed its first Amendment and Request for Reconsideration. (See Picanso Decl., Ex. C, First Amendment and Request for Reconsideration.)  The examiner granted MacDermid's request but, upon reconsideration, again rejected claims 1-19 and 21-22 of the '811 Application as obvious. (Picanso Decl., Ex. D, 3-22-01 Office Action at ¶¶ 2-5.)[6]  The examiner found these claims unpatentable over United States Patent No. 4,994,344 ("Kurtz"), as combined with other prior art references, including United States Patent No. 5,262,575 ("Fan"). (Id.)  In pertinent part, the examiner stated that Kurtz:

> teach[es] flexographic relief printing plates comprising at least one photopolymerizable recording layer containing at least one polymetric binder, at least one photoinitiator and at least one inhibitor []. Examples of suitable photoinitiators include acylarylphosphine oxides which is preferably present in an amount of 0.3 to 4% weight [].  It is the Examiner's position [that] the phosphine oxide initiator meet[s] the present limitations for an oxygen scavenger.

(Id. at ¶ 6(a) (emphasis added).)

MacDermid responded by filing a second Amendment and Request for Reconsideration. (Picanso Decl., Ex. E, Second Amendment and Request for Reconsideration.)  With respect to the examiner's position that Kurtz taught the use of phosphine oxide, which met

---

[6] The examiner also rejected claims 22-23 as indefinite under 35 U.S.C. § 112 and objected to claim 20 as dependent upon a rejected claim.  (Id. at ¶¶ 3-7, 9.)

the oxygen scavenger limitation, MacDermid stated:

>      Applicant's claims expressly state that flexo-
> graphic printing elements according to the invention
> are those comprising a layer of solid photocurable
> material that, in turn, comprise <u>an oxygen scavenger</u>.
> . . .   The specification teaches that preferred oxygen
> scavengers are phosphine compounds such as, for
> example, triphenylphosphine . . . .
>      <u>Neither cited reference discloses a printing</u>
> <u>element that comprises an oxygen scavenger.</u>   Although
> the Examiner alleges that the phosphine oxide
> photoinitiators disclosed by the Kurtz patent "meet the
> present limitations for an oxygen scavenger" (Office
> Action at 3), there is no reason to believe that
> compounds having such high oxidation states could react
> with, and thereby "scavenge" oxygen.   As is evidenced
> by "Concerning the Mechanism of the Reduction of
> Hydroperoxides by Trisubstituted Phosphines and
> Trisubstituted Phosphites," . . . trisubstituted
> phosphines and pohosphites [sic] are oxidized to yield
> phosphine oxide, which does not undergo further
> oxidation.   Since phosphine oxides would not function
> as an oxygen scavenger, the proposed combination of
> Kurtz and Fan would not have produced Applicant's
> claimed invention.[1] . . .
>
>      [1] It has been assumed, for the sake of
> argument, that one of ordinary skill would have been
> motivated to make the combination of Kurtz and Fan as
> proposed in the Final Office Action.   However, it is
> questionable at best that such a combination would be
> made by one skilled in the art at the time of
> Applicant's invention given that <u>one skilled in the art</u>
> <u>would have recognized that phosphine oxides would not</u>
> <u>scavenge oxygen.</u>

(<u>Id.</u> at ¶ 1 (first instance of emphasis in original, other

emphasis added).)

     The examiner thereafter issued a June 22, 2001 Office

Action, granting MacDermid's second request for reconsideration.

(Picanso Decl., Ex. F, 6-22-01 Office Action.)  Upon
reconsideration, the examiner again rejected claims 1-19 and
21-23 as unpatentable over Kurtz, albeit on other grounds.  (Id.)
The examiner stated that MacDermid's "arguments with respect to
claims 1-19 and 21-23 [had] been considered but [were] moot in
view of the new ground(s) of rejection."  (Id. at ¶ 6.)[7]

MacDermid filed a third request for reconsideration, arguing
that the examiner should not have combined Kurtz with Canty
and/or Fan.  (Picanso Decl., Ex. G, Third Request for
Reconsideration.)  The examiner granted the third request for
reconsideration and again rejected the claims as unpatentable,
relying on grounds other than those quoted above.  (Picanso
Decl., Ex. H, 11-27-01 Office Action.)[8]

MacDermid filed a Preliminary Amendment and Response on
January 18, 2002, canceling claims 1-9 and 18-20, adding new
claims 24 and 25, and requesting a fourth reconsideration of the
examiners' rejection of the remaining claims.  (Dkt. entry no.
147-3, Ex. I, Preliminary Amendment and Response.)  Subject to
certain examiner amendments, the examiner withdrew all rejections

_____

[7] The examiner again found, as she had in the October 2,
2000 office action, that: (1) prior art disclosed the use of
triphenylphosphine; and (2) triphenylphosphine met the oxygen
scavenger limitation.  (6-22-01 Office Action at 2.)

[8] The examiner again stated her finding that triphenyl-
phosphine met the limitation for an oxygen scavenger.  (11-27-01
Office Action at 2.)

on March 20, 2002 and allowed claims 10-17, 21-23, and 25.  (See Picanso Decl., Ex. J, Interview Summary (noting MacDermid's authorization for cancellation of claim 24); Picanso Decl., Ex. K, Notice of Allowability.)  The examiner, while explaining her reasons for allowing the application to issue, did not discuss the prior art's teaching regarding phosphine oxide, and did not reference or mention the allowed claims' respective oxygen scavenger limitations.  (See id.)

The '811 Application issued as the '699 Patent on July 2, 2002, with claims 10-17, 21-23, and 25 of the '811 Application renumbered as claims 1-12 of the '699 Patent.  Each of the twelve claims either explicitly or, through dependency, contains an oxygen scavenger limitation.  ('699 Patent at col. 10, lines 32-66, col.11, lines 1-33, col. 12, lines 1-26.)[9]

**B.    The '835 Reissue Patent**

MacDermid filed an application for reissue of the '699 Patent on January 6, 2004, and the PTO assigned it United States Patent Application No. 10/752,484 ("Reissue Application"). (Picanso Decl., Ex. L, Reissue Application; SOF at ¶ 14; Response

---

[9] Claims 1 and 10 of the '699 Patent are the only independent claims.  Claim 1 recites, in part, "a method comprising . . . a layer of solid photocurable material that has first and second opposing major faces, said first opposing major face disposed upon said support layer, wherein said layer of solid photocurable material comprises an oxygen scavenger". ('699 Patent at col. 10, lines 32, 38-42.)  Claim 10 contains the same limitation.  (Id. at col. 11, lines 30-31, col. 12, lines 1-3.)

to SOF at ¶ 14.)   In remarks accompanying the Reissue

Application, MacDermid stated:

> Existing claims 1-12 remain unchanged in this
> application for reissue of the ['699 Patent].  New
> claims 13-29 have been added to broaden the scope of
> the '699 [P]atent.
>     New claims 13-29 contain essentially all of the
> same features as existing claims 1-12, except that
> these new claims do not require an oxygen scavenger in
> the solid photocurable material.

(Reissue Application at 10.)  In its support for the new claims,

MacDermid further stated:

> Support for new claims 13-29 can be found in the
> specification (for example at column 2, lines 38-48
> and column 6, lines 51-57). . . .
>     As set forth in the specification, <u>one way</u> to
> counter the effects of oxygen inhibition is to
> incorporate oxygen scavengers into the polymer
> formulation.  However, applicant's disclosure does not
> limit the photopolymer formulation to only those
> formulations that incorporate an oxygen scavenger.
> Other means to counter the effects of oxygen
> inhibitions are well known to those skilled in the
> art . . . .

(<u>Id.</u> (emphasis in original).)

The examiner rejected several of the new claims as

improperly amended and/or obvious over prior art.  (Picanso

Decl., Ex. M, 3-31-06 Office Action.)  Because the bases for such

rejection are not material to this action, the Court will not

recite them.  MacDermid thereafter amended the new claims and

added claims 30-31.  (<u>See</u> Picanso Decl., Ex. O, Amendment and

Response at 9-10.)  The Reissue Application issued as the '835

Reissue Patent on September 11, 2007, with claims 1-12 from the
'699 Patent and new claims 13-31.  (See generally, '835 Reissue
Patent; see also SOF at ¶ 16; Response to SOF at ¶ 16.)

### DISCUSSION

DuPont now argues that the Asserted Claims, i.e., claims
13-18, 24-27, and 30-31 of the '835 Reissue Patent, are invalid
as violating the rule against recapture.  DuPont relies upon the
passages cited above from MacDermid's Second Amendment and
Request for Reconsideration and argues that MacDermid surrendered
any claims that lack an oxygen scavenger limitation.  MacDermid
argues, in response, that it did not surrender such claims.[10]
For the reasons set forth below, we conclude that MacDermid did
not surrender claims that lack an oxygen scavenger limitation
during prosecution of the '811 Application.

### I.   Standard of Review

Under Rule 56, the Court must grant a party's motion for
summary judgment if the moving party demonstrates, by reference
to evidence of record, that: (1) no genuine disputes as to any of
the material facts exists; and (2) the moving party is entitled
to judgment as a matter of law.  Fed.R.Civ.P. 56(a), (c); see

---

[10] MacDermid argues in the alternative that, even if it
surrendered such claims, it also materially narrowed those claims
and thus avoided the harsh penalty of the rule against recapture.
(Dkt. entry no. 147, MacDermid Opp'n Br. at 33-35.)  Because we
conclude that MacDermid did not surrender claims that lack an
oxygen scavenger limitation during prosecution of the '811
Application, we do not discuss MacDermid's alternative argument.

also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.
574, 586 n. 10 (1986) (noting that moving party bears initial
burden of proof).  "For an issue to be genuine, all that is
required is that sufficient evidence supporting the claimed
factual dispute be shown to require a jury or judge to resolve
the parties' differing versions of the truth at trial."  In re
Lemington Home for the Aged, No. 10-4456, 2011 WL 4375676, at *6
(3d Cir. Sept. 21, 2011) (citation and internal quotation marks
omitted).  "A material fact is a fact that might affect the
outcome of the suit under the governing law."  Id. (citation,
internal quotation marks, and some punctuation marks omitted).
If the moving party carries its burden, the burden shifts, and
the nonmoving party must then demonstrate, by reference to
evidence of record, that at least one genuine issue of material
fact exists.  Matsushita, 475 U.S. at 587.  The mere existence of
some evidence supporting the nonmoving party will not suffice to
meet this burden; there must be enough evidence to enable a jury
reasonably to find for the nonmoving party on that issue.  See
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The underlying facts in this case are taken directly from
the prosecution file histories and the claims of the '699 Patent
and the '835 Reissue Patent.  The Court, accordingly, will not
encounter disputed factual issues, as the question presented to
this Court is a purely legal question appropriate for summary

judgment.  See Guidant Corp. v. St. Jude Med., Inc., 409
F.Supp.2d 543, 549 (D. Del. 2001) (finding that comparison of
claims of original patent and reissued patent is an issue of
claim construction and that such an issue is a "purely legal
question appropriate for summary judgment.").

## II.  Reissue and the Rule Against Recapture

The patent reissue statute, 35 U.S.C. § 251 ("Section 251"),
provides that a patentee may, within the two-year period
following issuance of a patent, ask the PTO to reissue that
patent with amended or additional claims.  See 35 U.S.C. § 251.[11]
Section 251 states:

> Whenever any patent is, through error without any
> deceptive intention, deemed wholly or partly
> inoperative or invalid . . . by reason of the patentee
> claiming more or less than he had a right to claim in
> the patent, the Director shall . . . reissue the patent
> for the invention disclosed in the original patent, and
> in accordance with a new and amended application, for
> the unexpired part of the term of the original patent.
> No new matter shall be introduced into the application
> for reissue.

Id.

"The reissue statute was not[,]" however, "enacted as a
panacea for all patent prosecution problems, nor as a grant to
the patentee to prosecute de novo his original application."  MBO
Labs., 602 F.3d at 1313.  "[A] patentee is only entitled to a

---

[11] Such claims must find adequate support in the issued
patent's specification.  See In re Weiler, 790 F.2d 1576, 1580
(Fed. Cir. 1986).

reissue patent for broader claims when the patentee claimed 'less than he had a right to claim in the patent' through 'error without any deceptive intent,' not through deliberate amendments or arguments designed to convince an examiner to allow the claims." Id. (internal brackets omitted).[12]  Where a patentee deliberately surrenders subject matter to obtain allowance of his original claims, and later attempts to recapture the surrendered subject matter through reissue claims, the rule against recapture renders the patentee's reissue claims invalid.  See In re Mostafazadeh, 643 F.3d 1353, 1358 (Fed. Cir. 2011); see N. Am. Container, Inc. v. Plastipak Packaging, Inc., 415 F.3d 1335, 1349 (Fed. Cir. 2001).

"Under this rule against recapture, claims that are broader than the original patent claims in a manner directly pertinent to the subject matter surrendered during prosecution are impermissible." Mostafazadeh, 643 F.3d at 1358 (citation and internal quotation marks omitted); see N. Am. Container, 415 F.3d at 1349.  A party asserting that the rule against recapture invalidates reissue claims must prove such invalidity by clear and convincing evidence.  AIA Eng'g Ltd. v. Magotteaux Int'l S/A, 657 F.3d 1264, 1272 (Fed. Cir. 2011); Guidant, 409 F.Supp.2d at

---

[12]  Indeed, "[w]ithout a rule against recapture, an unscrupulous attorney could feign error and redraft claims in a reissue patent to cover a competing product, thereafter filing an infringement suit." MBO Labs., 602 F.3d at 1314.

549.  This is so because a reissue patent, like any other patent, is entitled to a presumption of validity.  See 35 U.S.C. § 282 ("A patent shall be presumed valid."); Microsoft Corp. v. i4i Ltd. P'ship, --- U.S. ----, 131 S.Ct. 2238, 2245 (2011) ("§ 282 establishes a presumption of patent validity, and it provides that a challenger must overcome that presumption to prevail on an invalidity defense.").

The Court, when examining reissue claims to determine whether such claims violate the rule against recapture, examines three elements.  Mostafazadeh, 643 F.3d at 1358; MBO Labs, 602 F.3d at 1314.  First, the Court must "determine whether and in what aspect the reissue claims are broader than the patent claims.  [A] reissue claim that deletes a limitation or element from the patent claims is broader with respect to the modified limitation."  Mostafazadeh, 643 F.3d at 1358 (citations and internal quotation marks omitted); see also Hester Indus., Inc. v. Stein, Inc., 142 F.3d 1472, 1480 (Fed. Cir. 1998) ("A reissue claim that does not include a limitation present in the original patent claims is broader in that respect.").

Second, the Court must determine whether the broader aspects of the reissue patent claims relate to subject matter that the applicant, during prosecution of the original patent, surrendered.  Mostafazadeh, 643 F.3d at 1358.  This inquiry necessarily involves a determine of what, if anything, the

applicant surrendered during prosecution of the original patent. "To determine whether an applicant surrendered particular subject matter, we look to the prosecution history for arguments and changes to the claims made in an effort to overcome a prior art rejection." Id. Indeed, to surrender subject material by argument, an applicant "must clearly and unmistakably argue that his invention does not cover certain subject matter to overcome an examiner's rejection based on prior art." MBO Labs., 602 F.3d at 1314; see also Kim v. ConAgra Foods, Inc., 465 F.3d 1312, 1322-23 (Fed. Cir. 2006).

Surrender is thus a question of intent. If an objective observer would conclude, after a full and thorough review of the patent prosecution history, that the applicant offers argument to overcome an examiner's prior art rejection, the applicant has surrendered subject matter that it cannot later reclaim through reissue. MBO Labs., 602 F.3d at 1314; Medtronic, Inc. v. Guidant Corp., 465 F.3d 1360, 1375 (Fed. Cir. 2006). An applicant, however, does not surrender subject matter if an objective observer would conclude that the applicant offers such argument for other reasons and thus does not evince an intent to admit that his claims are not patentable. Medtronic, 465 F.3d at 1375; In re Clement, 131 F.3d 1464, 1469 (Fed. Cir. 1997).

If the Court reaches the third element, it must consider whether the reissue claims, through broader than the original

16

claims in some respects, are materially narrowed in others such that they avoid "full or substantial recapture of [that] subject matter". <u>Mostafazadeh</u>, 643 F.3d at 1358.  "To avoid violation of the rule against recapture in this way, the narrowing must relate to the subject matter surrendered during the original prosecution (i.e., the applicant cannot recapture the full scope of what was surrendered)." <u>Id.</u> at 1359.

## III. Application

### A.   The New Claims Are Broader Than the Original Claims

DuPont claims and MacDermid concedes that the Asserted Claims are broader the claims issued in the '699 Patent.  (<u>See</u> MacDermid Opp'n Br. at 17; dkt. entry no. 156, Tr. of Oral Arg. at 20 ("Judge, we concede on step one.").)  We agree.  The Asserted claims are broader than the claims issued in the '699 Patent because they, unlike the claims issued in the '699 Patent, lack an oxygen scavenger limitation.  <u>See</u> <u>Mostafazadeh</u>, 643 F.3d at 1358; <u>Hester Indus.</u>, 142 F.3d at 1480 ("A reissue claim that does not include a limitation present in the original patent claims is broader in that respect.").

MacDermid, in remarks accompanying the Reissue Application, stated:

> Existing claims 1-12 remain unchanged in this application for reissue of the ['699 Patent].  New claims 13-29 have been added to broaden the scope of the '699 [P]atent.

> New claims 13-29 contain essentially all of the
> same features as existing claims 1-12, except that
> these new claims do not require an oxygen scavenger in
> the solid photocurable material.

(Reissue Application at 10 (emphasis added).)  In support of the

new claims, MacDermid further stated:

> Support for new claims 13-29 can be found in the
> specification (for example at column 2, lines 38-48 and
> column 6, lines 51-57). . . .
> As set forth in the specification, one way to
> counter the effects of oxygen inhibition is to incor-
> porate oxygen scavengers into the polymer formulation.
> However, applicant's disclosure does not limit the
> photopolymer formulation to only those formulations
> that incorporate an oxygen scavenger.  Other means to
> counter the effects of oxygen inhibitions are well
> known to those skilled in the art . . . .

(Id. (some emphasis omitted, some emphasis added).)

### B.    MacDermid Did Not Surrender Embodiments of the Invention that Lack an Oxygen Scavenger Limitation

DuPont, in its brief upon the motion, cites to only one

portion of the patent prosecution history, the Second Amendment

and Request for Reconsideration, in support of its argument that

MacDermid surrendered embodiments of the invention that lack an

oxygen scavenger limitation.  We have reprinted the cited

portion, with DuPont's emphasis, below:

> Applicant's claims expressly state that flexographic
> printing elements according to the invention are those
> comprising a layer of solid photocurable material that,
> in turn, comprise an oxygen scavenger (see for example,
> claim 1). . . .

> Neither cited reference [i.e., Kurtz nor Fan] discloses
> a printing element that comprises an oxygen scavenger.
> Although the Examiner alleges that the phosphine oxide
> photoinitiators disclosed by the Kurtz patent "meet the
> present limitations for an oxygen scavenger" (Office
> Action at 3), there is no reason to believe that
> compounds having such high oxidation states could react
> with, and thereby "scavenge" oxygen. . . .  Since
> phosphine oxide would not function as an oxygen
> scavenger, the proposed combination of Kurtz and Fan
> would not have produced Applicant's claimed invention.
> Accordingly, reconsideration and withdrawal of the
> invention [sic] is respectfully requested.

(Dkt. entry no. 142-1, DuPont Br. at 6-7 (emphasis appearing and
footnote omitted in DuPont's Br.) (citing Second Amendment and
Request for Reconsideration).)  DuPont argues that, in the
passage above, MacDermid relied upon the oxygen scavenger
limitation to distinguish its invention from the prior art.  (Id.
at 7; dkt. entry no. 151, DuPont Reply Br. at 1-2.)

MacDermid contends that DuPont, the party bearing the burden
of proof, has failed to demonstrate that the Asserted Claims
violate the rule against recapture because it has failed to
demonstrate that MacDermid clearly and unmistakably surrendered
embodiments of the invention that lack an oxygen scavenger
limitation. (See MacDermid Opp'n Br. at 21-27, 29-30, 32-33.)
MacDermid further argues that DuPont cannot meet its burden
because MacDermid, through the Second Amendment and Request for
Reconsideration, did not attempt to distinguish its claims from
prior art in an attempt to secure the patent.  (Id. at 22-24.)
MacDermid instead argues that, in the Second Amendment and

19

Request for Reconsideration, it merely attempted to correct the examiner's erroneous finding that phosphine oxide can function as an oxygen scavenger. (Id. at 23-24.)

The Court, upon consideration of the parties' arguments, agrees with MacDermid and concludes that the Asserted Claims do not violate the rule against recapture. An objective observer, after reviewing the patent prosecution history, could not conclude that MacDermid, through the Second Amendment and Request for Reconsideration, clearly and unmistakably surrendered subject matter. (See Second Amendment and Request for Reconsideration at ¶ 1.) See also MBO Labs., 602 F.3d at 1314; Medtronic, 465 F.3d at 1375.

This matter is unlike the cases relied upon by DuPont, where parties have successfully raised the rule against recapture to invalidate claims. (See Reply Br. at 4 (citing and discussing MBO Labs., supra).) In MBO Labs., for example, both the reissue patent ("MBO Reissue Patent") and the related family of patents disclosed a design for a hypodermic safety syringe "intended to protect health care workers . . . from inadvertent needle sticks following an injection or drawing of fluid" by mounting the hypodermic needle inside a "guard body". MBO Labs., 602 F.3d at 1308.[13] After being inserted into a patient, the needle slid

---

[13] The related family of patents includes an original patent ("Original MBO Patent"), two continuation-in-part patents ("MBO Continuation Patents"), and an abandoned continuation-in-part application. MBO Labs., 602 F.3d at 1309.

backward relative to, and remained sheathed inside, the guard body.  Id.

The application that issued as the Original MBO Patent contained a claim reciting a "disposable medical assembly" comprising, among other things, a "guide means and manipulating means being _relatively_ _movable_".  Id. at 1309 (emphasis in original).  The PTO rejected this claim as obvious over prior art and the applicant, MBO Laboratories, Inc. ("MBO"), attempted to overcome the PTO rejection by further limiting its claims.  Id. at 1309-10.  MBO explained to the PTO that the added limitations related to a "chief feature of the applicants' invention" -- "the safe _retraction_ of the needle".  Id. at 1310 (emphasis added). The examiner, following resolution of other, unrelated proposed amendments, allowed the Original MBO Patent to issue.  Id. at 1311.

MBO, during prosecution of the patent applications that issued as the MBO Continuation Patents, continued to argue that its claimed invention differed from prior art.  It specifically and continually argued that the prior art disclosed an assembly comprising a stationary needle, whereas the claimed invention comprised a stationary guard body and movable needle.  Id. at 1310-11, 1314-16 (demonstrating that MBO raised this argument during both prosecution of the patent applications that issued as the MBO Continuation Patents).

21

MBO then filed the application that would later issue as the MBO Reissue Patent.  Through the reissue application, MBO argued that it erroneously limited the claims of the Original MBO Patents to a "system wherein the needle must be . . . moved toward the safety device".  Id. at 1311.  It further argued that the Original MBO Patent's specification allowed it to more broadly claim "a system having 'any relative movement between the needle and the body'" and thus sought patent claims for an assembly comprising, in part, a stationary needle within a movable guard body.  See id.  The PTO granted the reissue application without objection.  Id.

MBO thereafter filed suit against Becton, Dickinson & Co. ("BDC"), alleging that BDC infringed the MBO Reissue Patent claims.  Id.  BDC denied liability, arguing that those claims were invalid as violating the rule against recapture.  Id. at 1312.  Both the district court and the United States Court of Appeals for the Federal Circuit agreed with BDC, finding that the MBO Reissue Patent claims were invalid as violating the rule against recapture.  Id. at 1312-16, 1319.  The Federal Circuit, upon consideration of the foregoing patent prosecution history, stated:

> this court need only address the second step [in rule against recapture analysis] to determine whether MBO surrendered subject matter and whether the broader aspects of MBO's reissued claim related to the surrendered subject matter. . . .

22

> Substantial evidence supports the district court's
> finding that MBO clearly and unmistakably surrendered
> claiming a guard body that moved relative to a fixed
> needle.  MBO twice overcame the examiner's rejections
> by emphasizing that the prior art disclosed a type of
> guard that moved relative to a fixed needle.  In
> contrast, MBO stressed that its needle moved relative
> to the guard by "slidably retracting."

Id. at 1314-15.

MBO's actions during prosecution of its original and continuation-in-part patent applications contrasts with MacDermid's actions in this matter.  MBO "clearly and unmistakably" surrendered subject material during prosecution of its claims; to secure its claim to an assembly with a movable needle, MBO distinguished its claimed invention from prior art on the basis of a specific claim limitation, i.e., the "slidably retracting" or "movable" needle.  It demonstrated its intent to distinguish its claimed invention from the prior art, to secure a patent on its claimed invention, and to surrender any claims that it might otherwise hold to embodiments of its invention that replaced the "slidably retracting" or "movable" needle limitation with a stationary needle and movable guard body or sheath.  Id. MBO was thus later estopped, by the rule against recapture, from asserting claims that lacked that limitation.  Id.

MacDermid, by contrast, did not evince an intent through cited portions of the patent prosecution history (that is, the Second Amendment and Request for Reconsideration) to surrender

23

embodiments of its invention that lacked an oxygen scavenger limitation.  We find that MacDermid instead evinced an intent only to educate the examiner and correct the examiner's mistaken finding that phosphine oxide was capable of scavenging oxygen and thus solving the issues associated with executing DTP processes in an oxygen-rich environment.

We acknowledge, as DuPont highlights in its Reply Brief, that MacDermid stated that "[n]either [Kurtz nor Fan] discloses a printing element that comprises an oxygen scavenger."  (Reply Br. at 6-7 (citing Second Amendment and Request for Reconsideration.) This statement cannot, however, be read in a vacuum; it must be read in the proper context.  MacDermid's full statement, as it concerns phosphine oxide's capacity for scavenging oxygen, follows:

> [n]either cited reference discloses a printing element that comprises an oxygen scavenger.  Although the Examiner alleges that the phosphine oxide photoinitiators disclosed by the Kurtz patent "meet the present limitations for an oxygen scavenger" (Office Action at 3), there is no reason to believe that compounds having such high oxidation states could react with, and thereby "scavenge" oxygen.  As is evidenced by "Concerning the Mechanism of the Reduction of Hydroperoxides by Trisubstituted Phosphines and Trisubstituted Phosphites," . . . trisubstituted phosphines and pohosphites [sic] are oxidized to yield phosphine oxide, which does not undergo further oxidation.

(Second Amendment and Request for Reconsideration at ¶ 1.)  An objective observer, reading this passage in full, would find just

24

as the Court now finds that this portion of the Second Amendment and Request for Reconsideration demonstrates MacDermid's intent to educate the examiner.  The examiner earlier found that Kurtz taught the use of phosphine oxide photoinitiators, that phosphine oxide could scavenge oxygen, and that Kurtz's teaching of phosphine oxide thus met the invention's proposed oxygen scavenger limitation.  (3-22-01 Office Action at ¶ 6.)  MacDermid disagreed with the latter two findings.  (Second Amendment and Request for Reconsideration at

¶ 1.)

The Court, for good cause appearing, will thus issue an appropriate Order.


s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge


Dated:   May 9, 2012