**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____

MacDERMID PRINTING SOLUTIONS,
L.L.C.,

          CIVIL ACTION NUMBER:

      Plaintiff,

          3:07-cv-07-4325

     -vs-

E.I. DuPONT DeNEMOURS AND
COMPANY,

          MOTION FOR SUMMARY

     Defendant.         JUDGMENT
_____

     Clarkson S. Fisher United States Courthouse
     402 East State Street
     Trenton, New Jersey 08608
     April 16, 2013

B E F O R E:        THE HONORABLE MARY L. COOPER
             UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

CARMODY & TORRANCE
BY:  JOHN R. HORVACK, JR., ESQUIRE
And
ROBINSON WETTRE & MILLER, LLC
BY:  DONALD A. ROBINSON, ESQUIRE
Attorneys for the Plaintiff

CONNELL FOLEY
BY:  TRICIA B. O'REILLY , ESQUIRE
And
VINSON & ELKINS
BY:  ANDREW J. ALLEN, ESQUIRE
     CHARLES D. OSSOLA, ESQUIRE
Attorneys for the Defendant


     Certified as True and Correct as required by Title 28,
U.S.C., Section 753
     /S/ Regina A. Berenato-Tell, RMR, CRR, CCR

—————————————— Motion - 4/16/13 ——————————————

1    TRENTON, NEW JERSEY  WEDNESDAY, APRIL 16, 2013  2:10 P.M.

2                   (Call to order of the Court.)

3           THE COURT:  Good afternoon, everyone.

4           We're here today on MacDermid versus DuPont, number

5    07-4325.  I know you have given your appearances to the

6    deputy, but you may state them for the record now.

7           MR. ROBINSON:  Yes.  For MacDermid, local counsel,

8    Don Robinson.

9           MR. HORVACK:  And John Horvack for Carmody and

10   Torrance for MacDermid.

11          MS. O'REILLY:  Good afternoon, Your Honor.  Tricia

12   O'Reilly from Connell Foley on behalf of DuPont.

13          MR. OSSOLA:  Good afternoon, Your Honor.  Charles

14   Ossola with Vinson and Elkins on behalf of DuPont.

15          MR. ALLEN:  And Andrew Allen with Vinson and Elkins

16   on behalf of DuPont.

17          THE COURT:  All right.  Thank you.

18          This is DuPont's motion limited to its contention

19   that the '835 patent is invalid based upon prior on sale and

20   on use -- in use facts that DuPont offers.  Right?

21          MR. OSSOLA:  Yes.  Yes, Your Honor.

22          THE COURT:  So would you like to proceed, Mr. Ossola?

23          MR. OSSOLA:  Your Honor, may I hand up to the Court

24   two copies of the presentation.  I have already given copies

25   to Mr. Horvack and Mr. Robinson.

—————— Motion - 4/16/13 ——————

1           THE COURT:  Thank you.

2       I wanted to have a word with my law clerk for a second.

3           Thank you.  Okay.  Go ahead.

4           MR. OSSOLA:  All right.  Good afternoon, Your Honor.

5   This is Charles Ossola on behalf of DuPont, and I'm here to

6   present argument on DuPont's motion for summary judgment of

7   invalidity of U.S. patent RE39,835.

8           THE COURT:  One question has occurred to me as I have

9   been travelling through this motion, which is:  You had some

10  other summary judgment motions that were filed, and then there

11  were some discovery disputes or motions to strike, rather --

12          MR. OSSOLA:  Yes.

13          THE COURT:  -- and, so, we terminated those other

14  summary judgment motions, obviously, intending that you would

15  be back with those if you saw fit once you took care of things

16  with the Magistrate Judge.  Are any of those motions coming

17  back at us?

18          MR. OSSOLA:  Yes, Your Honor.

19          THE COURT:  Which ones?

20          MR. OSSOLA:  Well, subject to the ruling under motion

21  to strike -- or rulings under motions to strike.  I think it

22  affects three of the summary judgment motions.

23          THE COURT:  In this case?

24          MR. OSSOLA:  In --

25          THE COURT:  MacDermid versus DuPont.

────── Motion - 4/16/13 ──────

1    MR. OSSOLA:  In their case.  Right.  One is a summary

2  judgment motion of infringement of the '859 patent, right?  So

3  one of them is our motion on our patent, and I believe the

4  other two are MacDermid's motions.

5    THE COURT:  Okay.  I don't mean to ask you for

6  something that's not in the forefront.  What I'm basically

7  getting at is that as MacDermid responds to the motion that

8  you have pending today they say, Well, DuPont has abandoned

9  its claim that the '835 patent is invalid as obvious --

10    MR. OSSOLA:  We have not.

11    THE COURT:  -- over an earlier DuPont patent.

12    MR. OSSOLA:  We have not abandoned any arguments, so

13  that's incorrect.

14    THE COURT:  Okay.  So this is just a limited argument

15  devoted to the ground that you're putting before us today --

16    MR. OSSOLA:  That's right.

17    THE COURT:  -- to challenge the '835 patent.

18    MR. OSSOLA:  That's right.

19    THE COURT:  Okay.

20    MR. OSSOLA:  And there may be -- if this matter goes

21  to trial there will be an issue about obviousness of the '835

22  patent.  It is not the subject of the summary judgment motion.

23    THE COURT:  Before me now.

24    MR. OSSOLA:  That's correct.

25    THE COURT:  And are you planning to bring the summary

 1   judgment on obviousness under the '835 patent, did you

 2   already?

 3           MR. OSSOLA:  We have not already.  I think whether we

 4   do in --

 5           THE COURT:  It obviously depends.

 6           MR. OSSOLA:  It depends.  I mean, we are trying --

 7   I'm sure Mr. Horvack is trying, too, to triage this so you're

 8   not too burdened, so we have filed certain motions --

 9           THE COURT:  Okay.  Fine.

10           MR. OSSOLA:  -- but it certainly is true that we are

11   unable to proceed in those other motions until Magistrate

12   Judge Bongiovanni rules on the motions to strike, so we are

13   waiting for that ruling, and then I think, certainly, our

14   intention is to refile those motions.

15           THE COURT:  And whether or not one of those motions

16   was to invalidate the '835 patent based upon basic

17   obviousness, you haven't given up that issue.

18           MR. OSSOLA:  One of those motions is not that.  So we

19   haven't moved on obviousness on '835.  We, certainly, have

20   preserved the issue for trial, so the representation by

21   MacDermid that we have abandoned it is not true.

22           THE COURT:  Okay.

23           MR. OSSOLA:  And whether we might file a subsequent

24   motion on obviousness does, in fact, depend -- obviously, if

25   this motion is successful then we would not do so, and we

—Motion - 4/16/13—

1   still may not do so depending, frankly, Your Honor, on how the

2   whole picture looks.

3          THE COURT:  Understood.  Understood.  Sure.  There's

4   no law that says you have to file a summary judgment on every

5   issue that's contemplated for trial.

6          MR. OSSOLA:  We're trying to avoid that.

7          THE COURT:  Okay.  With that then I'll focus on this

8   motion.

9          MR. OSSOLA:  Thank you.  This motion is limited, as

10  the Court has acknowledged.  We are focusing really solely on

11  a prior art plate, the 45 DPS plate that we believe is grounds

12  both on on sale bar and -- both because it was sold, it was

13  manufactured and distributed, so we have an on sale bar issue,

14  and we have the fact that it was in use, prior public use.

15         THE COURT:  Public use.

16         MR. OSSOLA:  So we have got both prongs of 102(b)

17  involved in this issue, and with the Court's indulgence, Mr.

18  Allen is going to address certain claims that involve

19  absorption limitations that are only a few of the claims, and

20  then Claim 27 that has a slightly different analysis.

21         THE COURT:  I have made a good effort to get through

22  all this paper, and I got through it all.  Comprehension is a

23  good challenge.  Go ahead.

24         MR. OSSOLA:  We will try to assist the Court, and,

25  obviously, be ready to answer questions and try to clarify the

 1  issues.

 2        The issue really, first, just to give an overview of

 3  our position, this is not a motion, Your Honor, that I'm sure

 4  you have encountered where you need to look at a variety of

 5  public art or prior art and put it together and look at it.

 6  That is not this motion.  This motion is predicated on facts

 7  pertaining to DuPont's 45 DPS plates.  And I would represent

 8  to Your Honor that those facts that are affirmatively

 9  presented by DuPont are not controverted on this record.

10  There is a dispute about corroboration, which I think is the

11  centerpiece of their defense, but as to the facts that I will

12  walk you through, the key facts, there is nothing in the

13  record to contradict those facts.  There are, in our view,

14  misrepresentations of that record, but there is nothing

15  affirmatively in the record to dispute what I'm about to walk

16  you through.

17        So, we believe the clear and convincing standard that

18  is applicable here of invalidity is demonstrated by this

19  record, and we don't -- we believe there is no genuine issue

20  of material fact that stands in the way of summary judgment.

21  And that is particularly important, obviously, on any

22  motion -- summary judgment motion, dispositive motion, but

23  here in particular where there are various things that have

24  been denied by MacDermid or that have been alleged by

25  MacDermid that we believe do not raise a genuine issue of

—Motion - 4/16/13—

1   material fact, that raise neither tangential issues that are

2   not core to this motion or they raise no genuine issue at all.

3   But I emphasize the genuine issue of material facts because

4   that will be important.

5           THE COURT:  When I'm nodding my head, I'm indicating

6   I'm hearing you and understanding you and nothing more.

7           MR. OSSOLA:  We understand that, Your Honor.

8           THE COURT:  Okay.

9           MR. OSSOLA:  So to reorient you -- and I know we have

10  been through Markman on this patent and the prior summary

11  judgment motion on this patent, but you have had who knows how

12  many cases in between, but we are talking about a reissued

13  patent, the only patent that is asserted against DuPont by

14  MacDermid.  We are talking about a critical date that is

15  important, which is one year before filing, which is

16  October 11th, 1998, for purposes of the discussion of 45 DPS,

17  which, by the way, I should tell you what it is:  It is a

18  digital plate that was developed by DuPont and that had a

19  base, a photopolymer, a LAMS layer -- I'm going to walk you

20  through that -- and that base, as we will discuss with you,

21  the Cronar® Blue Base, as it is called, had the elements that

22  are presented in these claims.

23          THE COURT:  I understand that's your point.  There

24  was a DPS, and there were a few other plates in various times

25  that had a different last initial like DPU.  Does the "S"

—————— Motion - 4/16/13 ——————

1    stand for anything, do you know?

2            MR. OSSOLA:  Yes.  I'm going to have to ask Mr. Allen

3    what that particular acronym is.

4            THE COURT:  You don't have to.  I mean, that's okay.

5            MR. OSSOLA:  I mean, first of all, it was -- that's

6    what they designated it as.  I'm trying to recall why DuPont

7    did that.  It is not the DPU plate.

8            THE COURT:  Right.  Right.  And it is a 45 mil?

9            MR. OSSOLA:  Yes.  That's the gauge.  That's the

10   thickness of the plate.

11           THE COURT:  Right.  Okay.  Go ahead.

12           MR. OSSOLA:  So that is the only plate we're talking

13   about here today.

14           THE COURT:  Okay.

15           MR. OSSOLA:  The asserted claims, there are 12 of

16   them.  Some are method claims.  Some are product claims.  We

17   have outlined them here.  And, you know, I guess the general

18   description here of what we're talking about in the patent are

19   digital flexographic printing plates having a UV-absorbing

20   support layer, and the Court may recall that phraseology and

21   that issue from the Markman hearing, and we'll get to that.

22           So what is our position?  Our position is that all of

23   these asserted claims, all 12 of them, of the '835 patent are

24   invalid under the on sale or public use bars of 102(b), and

25   the principal basis for that is that prior to the critical

— Motion - 4/16/13 —

1   date, October 11th, 1998, DuPont sold 45 DPS plates to

2   domestic customers.  And we believe that the record that we

3   will walk you through, the key parts of that are presented

4   with our motion, establish that in a clear and convincing way

5   and that there is no evidence to contradict it.

6        Secondly, our argument is that DuPont publicly used

7   its 45 DPS plate to make printing plate samples for domestic

8   customers, and that that public use invalidates the method

9   claims 13 through 18.

10       One of the things that may help the Court to put this

11  in context is what was going on with this DPS plate.  This was

12  a digital plate way back in the 90's when DuPont, which was

13  the first to introduce a digital plate to the marketplace and

14  has many patents related to it, was seeking to move the

15  marketplace from the analog plates to the digital plates.  And

16  that's the context in which 45 DPS was developed, and when we

17  talk about the customer jobs, what was going on was DuPont was

18  manufacturing these plates, was promoting these plates, was

19  making these plates for customers according to their specs in

20  an effort to have customers move their business to digital

21  plates because of the many benefits that the Court is aware

22  of, I think from prior briefing, of digital versus analog.

23       THE COURT:  Well, then it was also in connection -- I

24  think the machine is called CPI that cost half a million

25  dollars that processed the blank plates into finished printing

—————————— Motion - 4/16/13 ——————————

1    plates.

2            MR. OSSOLA:  You're right.  So part of the --

3            THE COURT:  Right?

4            MR. OSSOLA:  Yes.  That is correct.  And part of the

5    transition to the marketplace is that in order to do this a

6    customer would have to acquire a processor -- an expensive

7    processor -- to digitally process these digital plates.  And

8    that was part and parcel of if you were going to make the

9    transition from analog to digital you had to have a processor

10   that could do that.  So you're quite right.

11        And it is quite important in the testing, the submitted

12   testimony of Dr. Taylor because that -- he was the person in

13   the middle of that.  The reason that he was doing what he was

14   doing, and the reason that it easily satisfies the public use

15   requirement is because they were trying to demonstrate to

16   customers that they should make this transition, and as the

17   Court knows, the investment.

18            All right.

19            THE COURT:  If this machine runs these blanks through

20   there you'll get a good printing plate out of it.

21            MR. OSSOLA:  Not only that, we'll show you, as Dr.

22   Taylor discussed in his declaration and as the various

23   exhibits attest to, in order to get customers to believe in

24   this what Dr. Taylor was part of an effort in doing is saying,

25   We'll show you.  You tell us what your specifications are, and

─── Motion - 4/16/13 ───

1   we will make these digital plates for you, send them to you,

2   and you'll see how good they are, and then you'll order the

3   digital plates and you'll eventually get the digital

4   processor.  And, in fact, I think Your Honor knows the

5   marketplace.  It turned out to be an enormous success.  The

6   marketplace accepted the digital technology, and there are a

7   very large number of digital processors out there in the

8   marketplace today.  But these were the early days.

9          THE COURT:  Okay.  Go ahead.

10          MR. OSSOLA:  So DuPont's 45 DPS plate, what was it?

11  It was a digital flexographic printing plate.  As I said, it

12  was developed, manufactured, and made commercially

13  available -- that was the whole point of doing this -- by

14  DuPont prior to October 1st, 1998.

15          The structure of the plate, in terms of what is this,

16  is familiar to the Court from Markman.  What we have

17  reproduced here is right out of the record.

18  Coversheet/Photopolymer/Support, sort of the parts of the

19  sandwich.  The LAMS -- the so-called LAMS layer was DuPont's

20  coversheet.  The photopolymer used was PLS, and where we'll

21  devote the most attention is Cronar® 773 Blue Base, which I'll

22  probably just call "Blue Base" during this argument, was the

23  support layer.

24          The method of use, the Court may recall this, you first

25  back expose, then you form the -- and why do you back

———Motion - 4/16/13———

1    exposure?  You're forming the base --

2            THE COURT:  The floor.

3            MR. OSSOLA:  The floor.

4            THE COURT:  -- in the middle layer by shining your

5    light through the support layer.

6            MR. OSSOLA:  Correct.

7            THE COURT:  Some of it getting through to the middle

8    layer.

9            MR. OSSOLA:  Some of it getting through with a goal

10   being a uniform floor.

11       So you back exposure, then you have the laser ablation

12   on the top.  You have the front exposure.  Laser ablation of

13   the LAMS layer, front exposure to create the relief, and then

14   at this point -- this was before the thermal development,

15   which is the subject of our other patent -- it was then

16   developed with a solvent.

17           THE COURT:  Okay.  Got it.

18           MR. OSSOLA:  Okay.  So what is the evidence that

19   we're asking that we presented to the Court that we contend

20   satisfies our burden of proof?  Well, let's focus for a moment

21   on the Blue Base.  It was a support layer with a uniform --

22           THE COURT:  It seems like almost all of your disputes

23   on this motion concern the support layer really.

24           MR. OSSOLA:  I believe that's true.

25           THE COURT:  Okay.

——— Motion - 4/16/13 ———

1          MR. OSSOLA:  And I think primarily -- at least the

2    way I see the briefing, stepping back and looking at it as to

3    whether it's been sufficiently -- our evidence has been

4    sufficiently corroborated, and I'll get to that legal point.

5          THE COURT:  Right.  We're talking about the base.

6          MR. OSSOLA:  We are.

7          THE COURT:  We're really not concerning ourselves

8    particularly with the ablatable layer or the polymer or the

9    middle layer.

10          MR. OSSOLA:  Some of the claim -- when you --

11    unfortunately, as you know, it is a claim-by-claim analysis.

12    Fortunately or unfortunately.  Some of the claims do deal with

13    that other structure.

14          THE COURT:  But I don't think there's any much fuss

15    about it.

16          MR. OSSOLA:  I agree.  There is not -- I agree with

17    that.

18          THE COURT:  Okay.  Go ahead.

19          MR. OSSOLA:  I don't think there are any genuine

20    issues of material fact with regard to those aspects of the

21    plate or any aspects of the plate.

22          All right.  So this support layer developed by

23    DuPont, as the documents we have submitted show -- they go

24    back to the early 90's -- originally tried out on thin analog

25    plates.  And, so, this Cronar® material, this Blue Base goes

———— Motion - 4/16/13 ————

1    back -- Exhibit K to the Taylor declaration -- to 1991.

2           THE COURT:  Okay.  Originally used on thin analog,

3    which would include a 45-mil analog plate.  Was there such a

4    thing?

5           MR. OSSOLA:  I believe there was.

6           THE COURT:  Okay.  But 45 or even a 67 would be a

7    thin plate, yes?

8           MR. OSSOLA:  Yes.

9           THE COURT:  Okay.  Go ahead.

10          MR. OSSOLA:  Exhibit K -- and I know that we have

11   tried to keep the exhibits to a minimum --

12          THE COURT:  I have had no trouble digging through the

13   exhibits.

14          MR. OSSOLA:  -- is a research report.

15          THE COURT:  I don't know necessarily what they say,

16   but I see them.

17          MR. OSSOLA:  It just -- hopefully it helped the

18   Court.  What Exhibit K really is when you look at it and when

19   you look back at it is it is a research report by DuPont for

20   its development of this Blue Base.  So it goes way back to

21   before the critical date when they developed this plate.  The

22   material specification for the Blue Base is important -- and

23   we'll tie this in later, and Mr. Allen will tie this back so

24   you can see why this is particularly important -- but the

25   record is clear, and, again, uncontroverted on this; there was

—— Motion - 4/16/13 ——

1  a range of UV absorption that was identified early on by

2  DuPont as between, and I apologize, it is a logarithmic ratio

3  of 1.930 to 2.340.  That is what the standard was, and that is

4  in the raw material specifications that's submitted in the

5  record.

6         And then there is the 30(b)(6) testimony of Dr. John

7  Shock, a longtime DuPont scientist who worked on and with Blue

8  Base -- Cronar® 773x Blue Base, and who testified at length

9  about it but, in particular, that the formulation and the

10 specifications never changed.

11        So let's step back for a moment.  I know the Court is

12 familiar with this, but we do have two different legal

13 standards that are applicable to the method and product

14 claims; the on sale bar, in which the question is whether the

15 product was sold in the United States prior to the patent's

16 critical date and whether the product embodies every

17 limitation.  Again, we're just talking about one product here.

18 And then the public use bar.  Was the method -- were the

19 methods claimed in the patent -- here the '835 patent --

20 publicly used in the United States prior to the patent's

21 critical date, and our argument is that DuPont commercially

22 exploited that method, practiced that method without act of

23 concealment.

24        In fact, as I just explained, that would have been

25 wholly contradictory to what DuPont was trying to accomplish,

1  which was to introduce this technology to customers and to the

2  marketplace.  So it was actively promoted in brochures, in

3  customer jobs, and in marketing efforts, and in disclosures to

4  the public.  And those methods embodied -- those methods that

5  were used by DuPont embodied every claim limitation.

6        So let's briefly talk about the corroboration

7  requirement, which arises in different contexts.  Sometimes it

8  arises as an issue related to an inventor's testimony.  That's

9  not this case.  This case, the corroboration issue has been

10  raised with respect to the testimony of the DuPont scientist,

11  but with due respect, we would say that it has also been

12  somewhat misrepresented.  It is -- consists of, of course,

13  testimony and excerpts of that testimony and, again, quite

14  extensive documentary evidence that is contemporaneous.  I'll

15  come back to that in a moment.

16        But what is the legal standard?  There's certainly no

17  dispute about that.  All pertinent evidence is examined.

18  There is no magic piece of evidence that must be there.

19  There's a suggestion by MacDermid that certain things are

20  missing that must be presented in order to satisfy the

21  corroboration requirement.  That is not the law.  It is true

22  that documentary or physical evidence that is made

23  contemporaneously provides the most reliable proof, and we

24  have provided that.  And that citation is from a Federal

25  Circuit case, the Sandt Tech. case.

———Motion - 4/16/13———

1      So let's move to the evidence on the sale, Your

2  Honor, if we may, and there were multiple sales.  We did not

3  want to -- we wanted to keep the record to a minimum here, so

4  we picked out three.  And as identified here on November 1997

5  to Banta Digital Group.  Another sale to that same group on

6  December 30th, 1997.  And then another sale before the

7  critical date, May 28th, 1998, to Cage Graphic Arts.  Those

8  sales and the invoices are -- I believe there's nothing in the

9  record to controvert that these sales were made and that they

10  were sales of the 45 DPS plate.

11      THE COURT:  And without looking at the invoice can

12  you confirm that the customers actually paid something for

13  these products?

14      MR. OSSOLA:  Yes.

15      THE COURT:  Were they promo pieces that were supplied

16  without charge?

17      MR. OSSOLA:  These were paid for, and the invoices --

18  and I'll move to the next one -- reflect that.  And this is

19  just one.  This is Exhibit N, a December 31, 1997 invoice.

20  And, as you can see -- and I'll address here, you know, one of

21  the points of clarity that we need to make here --

22      THE COURT:  So this would be an invoice to the

23  customer Banta?

24      MR. OSSOLA:  That's right.  And it shows the purchase

25  price on the right-hand side.  And what is this?  Well, it's

—— Motion - 4/16/13 ——

1   described by Dr. Taylor as providing the gauge and polymer

2   family 45 DPS that provides the EXP DD, which MacDermid

3   attempted to make into the genuine issue of material fact,

4   which means the record says only that those plates were

5   manufactured in Europe, and they're exported to the U.S.  The

6   facility, the DuPont facility manufacturing 45 DPS was in

7   Germany.  DuPont Deutschland is what "DD" means.  That was

8   explained by Dr. Taylor.

9        So, there isn't -- and, as you can see from this just

10  excerpt on the top line of the invoice 45 DPS EXP DD.  There

11  wasn't enough room spacewise -- and this was explained by Dr.

12  Taylor -- to have EXP DD replicated in the next line down, but

13  that's what it was.  It was a 45 DPS plate made for export.

14  That's it.  There isn't a genuine issue of fact as to whether

15  this is, indeed, the plate that was sold at that time.  This

16  is what it was called for the reasons I just outlined.

17       THE COURT:  I follow insofar as you're pointing to

18  the first line on that excerpt, but the second line looks like

19  another plate.  What is the second line that begins with the

20  number 106.68?

21       MR. OSSOLA:  The second line is giving --

22       THE COURT:  The centimeter measurement of the same

23  item?

24       MR. OSSOLA:  Exactly.

25       THE COURT:  Okay.  So 42 by 60 is inches.

──────── Motion - 4/16/13 ────────

1      MR. OSSOLA:  Yes.

2      THE COURT:  And 106.68 by 152.4 is centimeters.

3      MR. OSSOLA:  Yes.

4      THE COURT:  Okay.  Fine.

5      MR. OSSOLA:  All right.  So these 45 DPS plates were

6   used to make printing plate samples for U.S. customers, and I

7   referred to it earlier DuPont -- and it is in the documents --

8   referred to them as customer jobs.  They were done at the

9   behest of customers to assist customers in making a

10  transition.  May 5th, 1998, Cage Graphics there were -- one of

11  the 15 customer jobs that was done in this time frame was done

12  for them using 45 DPS plates.  This was performed by Dr.

13  Taylor.

14      THE COURT:  That would have been the shipment to Cage

15  on May 26, 1998?

16      MR. OSSOLA:  That's correct.  And Dr. Taylor laid

17  this out clearly and unequivocally, and it is not disputed.

18  In his personal knowledge he was responsible, he was involved,

19  he actually performed this with a team.  These jobs were done

20  by him and his team in Wilmington, Delaware at DuPont's

21  manufacturing facilities.  The details of processing the

22  plates for customers were logged, and we have presented that

23  to the Court, further verifying that these plates were made

24  and were processed by DuPont, that the method that was used

25  and they produced plates for customers.

—————— Motion - 4/16/13 ——————

1         And by the way, Exhibit G, which contains those

2    processing details for the customer jobs, identifies the

3    plates by batch numbers, identifies the customers.  I mean, it

4    is quite specific, and it is, obviously, contemporaneous.

5         There is no question on this record that DuPont was

6    not concealing this processing of these digital plates; was,

7    in fact, promoting in telling customers about it.

8         THE COURT:  So you have moved from on sale to public

9    use?

10        MR. OSSOLA:  Yes.  I'm sorry, I should have said

11   that, but you're correct.

12        THE COURT:  Okay.  Go ahead.

13        MR. OSSOLA:  So they were performed, as I said, at

14   the customer's request.  And the record shows that customers

15   had certain requirements, as you could imagine, of what they

16   wanted for plates; the relief depth, which was, in part,

17   depending on how the back exposure was performed, but this was

18   not an abstraction.  This was done for customers based on

19   their specifications.

20        THE COURT:  "BX" is an abbreviation for back

21   exposure?

22        MR. OSSOLA:  Yes, Your Honor.

23        THE COURT:  On your handout.

24        MR. OSSOLA:  Yes.  There was also in the record

25   contemporaneous brochure and operating manuals that described

—————— Motion - 4/16/13 ——————

1  all of the processing steps that DuPont went through with 45

2  DPS in publicly using the method described in this patent.

3          THE COURT:  Well --

4          MR. OSSOLA:  I'm sorry.

5          THE COURT:  Go ahead.

6          MR. OSSOLA:  And for the purpose of educating

7  customers about how they could do the same.

8          THE COURT:  Right.  But when it tells you what to do

9  it says, Use our good plate, our DPS plate, and here's what

10 you do with the plate as you operate this machine.

11         MR. OSSOLA:  Correct.

12         THE COURT:  Okay.  How much does it say about what

13 the plate consists of?

14         MR. OSSOLA:  Well, that is -- these particular

15 brochures, for example, Exhibits E and F, are the Digital

16 Imager Operating Guide that describe the actual steps, so

17 these particular exhibits do not explain the structure, but

18 the structure is in the record, and we'll get to that.  The

19 structure is also identified.  The structure and the

20 formulation.

21         THE COURT:  Well, this -- I think it brings us to

22 something that MacDermid is probably going to argue, so I'll

23 just let you address it now and then further later.  Handing

24 somebody the plate, is that enough to establish public use?

25         MR. OSSOLA:  No.

—Motion - 4/16/13—

1          THE COURT:  Even if the person doesn't know what the

2   sandwich consists of and can't readily disassemble the

3   sandwich and find out what it is and how it works?

4          MR. OSSOLA:  The answer is no.  And, of course,

5   that's not what we're arguing.  We're arguing that we publicly

6   used it.

7          THE COURT:  Used the plate, right.

8          MR. OSSOLA:  And we processed it.  But to answer --

9   further answer your question, if the customer with the manual

10  had the processor, had the plates then processed plates, that

11  would be other evidence prior to the critical date, that would

12  be other evidence of invalidity, but that is not this record,

13  and that is not our argument.

14         THE COURT:  No, I don't think that was my question.

15         MR. OSSOLA:  I'm sorry.

16         THE COURT:  I'm focusing on the plate.  I know that

17  the plate was available for sale and at the time of the

18  critical date the machine was available for sale.

19         MR. OSSOLA:  Yes.

20         THE COURT:  And instructions to the user, the

21  customer, as to how to make their own printing plates with

22  this machine using these blank plates, those instructions were

23  available.  It has to do with that case, forgive me, it is the

24  case where there was a tape -- it was some kind of tape, and

25  the question was whether you're publicly using it if the

—— Motion - 4/16/13 ——

1  customer can't tell what the tape is made of, but the tape is

2  out there.

3       MR. OSSOLA:  Right.

4       THE COURT:  So here the customer can, you know, get

5  the physical plate, but it can't find out or does it matter

6  whether the customer can find out what the plate is made of in

7  the field without getting hold of DuPont's specifications lab

8  specs?  Factory specs.

9       MR. OSSOLA:  It does not matter for purposes of this

10  motion.

11       THE COURT:  That's what I'm asking legally.

12       MR. OSSOLA:  It does not matter legally for purposes

13  of this motion.  In fact, customers had that information, but

14  that is not what we're -- but for purposes of this motion

15  we're not arguing that the customers were doing what you

16  described, taking a blank plate.  What we're saying is DuPont

17  was actually manufacturing, publicly disclosing the structure

18  and processing steps to customers as DuPont in these customer

19  jobs processed those customer plates.

20       THE COURT:  All right.

21       MR. OSSOLA:  Does that address Your Honor's question?

22  I want to make sure I do.

23       THE COURT:  No, because I'm asking does it matter

24  whether the customer -- way back at the beginning of this

25  case, and my memory of that is extremely hazy, and I'm not

—Motion - 4/16/13—

1   asking you to remember, but I remember people saying, well, if

2   you won't, you know -- if you won't give us your plate and

3   some information about how the plate is composed, we can't

4   just reverse engineer it by looking at the plates.  We can

5   slice it and dice it, but we still cannot tell what this plate

6   is made of so as to know what it is made of, unless we can get

7   your manufacturing specs.  We know we have a plate out there

8   in the field.  That's my question.  Is it public use if you

9   put this plate out there, you know, on display for the public

10  but do not tell them what the plate is made of?  Never mind

11  how it's used in a machine.

12          MR. OSSOLA:  No.  I believe the answer is no, Your

13  Honor.

14          THE COURT:  It is not public use.

15          MR. OSSOLA:  That would not be public use.

16          THE COURT:  What do you have to tell them about

17  what's in the plate in order for it to be public use?

18          MR. OSSOLA:  Well, the structure, formulation, which

19  was given to customers with regard to 45 DPS, and how to

20  process the plates, all that information was given to

21  customers.

22          THE COURT:  All right.  Let's move on then.

23          MR. OSSOLA:  Let me just mention the Gore case.  It

24  was a source of dispute.  In our view it shouldn't be.  It

25  involved the secret use of a patented process.  There's no

––––––––Motion - 4/16/13 ––––––––

 1   confidentiality agreements.  They didn't not have customers

 2   signing anything.  They wanted customers to have as much

 3   information as possible.  This is as far from law as you can

 4   get factually.

 5        All right.  Perhaps -- I hope this helps the Court a

 6   little bit.  The argument here about public use was that these

 7   jobs involved commercial exploitation of the patented feature

 8   by DuPont.

 9             THE COURT:  Yes.

10             MR. OSSOLA:  And they were incorporated into the

11   sales process, and they were critical to the success, as I

12   have made clear.  And we cite an old Supreme Court case, but

13   there are other authorities cited that practicing a process in

14   a factory in the usual course of producing articles for

15   commercial purposes is a public use, regardless of what the

16   customer knows; that's a public use.

17             All right.  This --

18             THE COURT:  Now, are these two tests product claims,

19   method claims, product claims on sale, method claims in public

20   use, is that how they line up?

21             MR. OSSOLA:  Generally, yes.

22             THE COURT:  Okay.

23             MR. OSSOLA:  So the product claims here, 30 and 31,

24   claim a digital flexographic printing plate having a

25   UV-absorbing support layer.  The method claims talk about

1  making a printing plate from a digital flexographic printing

2  plate having a UV-absorbable support layer, and then the

3  method claims 16 through 18 and 24 through 27 have to do with

4  those UV-absorbing support layers have certain specified

5  percentages of the UV radiation that's used in the back

6  exposure.

7        All right.  If we can break this down a little bit

8  first, and I think you're correct, there isn't a dispute about

9  at least some of these claims.  Claims 30 and 31, digital

10  flexographic printing plate comprising an ablation layer, the

11  LAMS layer, a layer of solid photocurable material, and a

12  support layer in which there's an actinic radiation-absorbing

13  compound that is uniformly distributed throughout.

14        THE COURT:  And it is made of this PET.

15        MR. OSSOLA:  And one of the claims says it must be

16  made of this PET, which DuPont's was.  And that isn't in

17  dispute, so I really don't think there's much of an issue

18  there.

19        This up on the screen, Slide 16 simply shows that --

20        THE COURT:  Just a second.  This radiation-absorbing

21  compound uniformly distributed throughout in the Blue Base.

22        MR. OSSOLA:  Right, Tinuvin® 900.

23        THE COURT:  I'm just not sure that that's conceded by

24  your adversary, that that was its setup.

25        MR. OSSOLA:  I think I already acknowledged that.

—— Motion - 4/16/13 ——

1   And I think that goes to the support layer.  You're correct.

2   I overstated it.  I think the first two elements, going back

3   to the Court's comment at the beginning, are really not at

4   issue.  The support layer is at issue.

5           THE COURT:  Okay.

6           MR. OSSOLA:  But we submit, while they tried to make

7   it an issue, it isn't.

8           THE COURT:  You say you got it, right?

9           MR. OSSOLA:  We've got it.  Going back to what you

10  saw before, we're talking about the LAMS layer, the polymer

11  used was called PLS.  Polymer and the Cronar® Blue Base.

12  That's what meets the elements of product claims 30 and 31.

13          But let's keep going.  The LAMS layer -- I won't linger

14  on this -- but it embodied the ablation layer limitations.  I

15  don't think this is even at all in dispute that the LAMS layer

16  was a UV-absorbing black layer sensitive to IR radiation.  The

17  Court has dealt with that before.  I don't think that's an

18  issue.

19          Similarly, the PLS photopolymer used by DuPont, it is

20  indisputably true and on the record.  I don't think it is

21  disputed that that also meets part of the elements of the

22  claims before we get to the support layer.

23           So let's get to that support layer, the Blue Base,

24  that the record establishes contains all of the elements of

25  the claims.  What did the formulation of that Blue Base

———— Motion - 4/16/13 ————

1    comprise of?  Well, PET, the -- I mentioned Tinuvin® 900,

2    that's the absorbing compound, the actinic radiation-absorbing

3    compound.  That's identified in the record in Taylor

4    declaration Exhibit K.  And there isn't any question based on

5    the record, again, there's nothing affirmative offered by

6    MacDermid on any of this that from the beginning the Blue Base

7    had this uniform absorbing -- UV-absorbing compound Tinuvin®

8    900 in it.  Dr. Shock was clear on that.  He was involved in

9    the development and use of it from the early 90's, and the

10   record plainly establishes that.

11          THE COURT:  Is that what makes the base blue?

12          MR. OSSOLA:  No.  There's a blue dye added to it.  I

13   think it is a dye.  Is that right?

14          MR. ALLEN:  Yes.

15          MR. OSSOLA:  Yes.  It is not the Tinuvin®, as I

16   understand it, there's also for whatever reason, and I can't

17   tell Your Honor the reason, there's also a blue dye that makes

18   it -- I think it is probably for marketing purposes gives it a

19   tinge.

20          THE COURT:  Okay.  Give me a second, please.

21       Henderson is your expert?

22          MR. OSSOLA:  Yes, Your Honor.

23          THE COURT:  And his declaration for this motion, as

24   distinguished from his expert report, his declaration to this

25   motion, which is exhibit -- with is exhibit -- it is a filing.

—— Motion - 4/16/13 ——

 1   It has got a year that's --

 2          MR. OSSOLA:  Yes, Your Honor.

 3          THE COURT:  0 through W.  Take your time.

 4          MR. OSSOLA:  Yes.  Give me a moment just to find it.

 5          THE COURT:  Oh, sure.  It is just on top of Exhibit

 6   O.  It comes after Exhibit M, but has a different --

 7          MR. OSSOLA:  I'm there with you.  Sorry.

 8          THE COURT:  Okay.  So you see the cover page is

 9   "Declaration of Henderson."

10          MR. OSSOLA:  Yes, Your Honor.

11          THE COURT:  And before we get to Exhibit O, Henderson

12   has given us nine pages to look at.

13          MR. OSSOLA:  That's right.

14          THE COURT:  With his signature on the last page.

15          MR. OSSOLA:  That's correct.

16          THE COURT:  And it is like a little mini report.

17          MR. OSSOLA:  That was intended to be that, yes.  Not

18   submit the whole expert report to Your Honor, but, rather,

19   focus on the issues that mattered to this motion.

20          THE COURT:  On page 3 of that --

21          MR. OSSOLA:  Yes.

22          THE COURT:  You may not have the answer to this, but

23   I was really struck by the last -- the next to last line read

24   in context, and it explains why I would be asking you whether

25   the blue was the Tinuvin®.

—— Motion - 4/16/13 ——

1        MR. OSSOLA:  Then I may be wrong because he talks

2   about Tinuvin® series of dyes; it could be that the Tinuvin®

3   had the blue color in it.

4        THE COURT:  Could be.

5        MR. OSSOLA:  And I wish I could be -- that was not my

6   understanding, and, perhaps, Mr. Allen can clarify this when

7   he gets up, but I agree with you.  The language "Tinuvin®

8   series of dyes," and I don't, frankly, think it affects this

9   motion, but in terms of the point you're raising, it does

10  imply that there was a dye in Tinuvin® 900.

11       THE COURT:  When we get to see, also, in his same

12  declaration down at Exhibit R --

13       MR. OSSOLA:  R, I believe, is his reference to Dr.

14  Kanga, MacDermid's expert.

15       THE COURT:  The opposing expert report.

16       MR. OSSOLA:  Right.

17       THE COURT:  And he is purportedly studying the

18  support layers he has been given --

19       MR. OSSOLA:  Right.

20       THE COURT:  -- from DuPont.

21       MR. OSSOLA:  Right.  For purposes of analyzing

22  infringement.

23       THE COURT:  And now where he got a raw support layer,

24  I don't know, but he says I had a raw support layer, and I was

25  also given a support layer integrated with the photopolymer

—————— Motion - 4/16/13 ——————

1  layer, so with that one I managed to scrape off or dissolve

2  off or peel off the photopolymer layer so as to get an

3  isolated -- he calls it a support layer from a plate, rather

4  than just a raw support layer.

5       At any rate, both of these support layers that this

6  fellow Kanga -- MacDermid's person -- tested, he starts out by

7  saying they were all clear, C-L-E-A-R, clear, and he doesn't

8  say they were blue, so I'm blue.

9       MR. OSSOLA:  I do not have -- and, perhaps, Mr.

10  Horvack will have an explanation for that.  It is consistent

11  with my understanding that there was a dye added, but how it

12  could have been -- one would have thought that the dye

13  remained in the support layer in the Cronar® material.  I just

14  don't know.

15       THE COURT:  You can see where I'm a little lost.

16       MR. OSSOLA:  I can see that.  I will respectfully

17  suggest to Your Honor that the color, the UV-absorbing

18  functionality was the Tinuvin®.

19       THE COURT:  I can buy that.

20       MR. OSSOLA:  Okay.

21       THE COURT:  Okay.  That's fine.  So we did your Slide

22  18.

23       MR. OSSOLA:  Okay.  All right.  Your Honor, so

24  further getting to the heart of the matter, the uniform

25  distribution.  The "uniformly distributed" terminology, which

——————————— Motion - 4/16/13 ———————————

1   the Court -- Your Honor interpreted the compound is dissolved

2   in, evenly dispersed in or copolymerized within said support

3   layer.  That's what it means.  Because that's what you said it

4   means, so, therefore, that is what it means.

5            THE COURT:  At the moment.

6            MR. OSSOLA:  Understood.  On the record there is no

7   genuine issue of material fact that the Tinuvin® 900 was

8   uniformly distributed throughout the base.  And we have given

9   you simply some of the quotations from Exhibit K that talk

10  about that uniform -- not only that it was mixed uniformly,

11  but, also, that it was dissolved and uniform distribution was

12  achieved.

13           Now, what MacDermid has pointed you to was one sentence

14  in that document -- I believe it was that document -- where

15  there was a reference to uneven or something of that sort

16  distribution.  That was -- but if you look at it in the

17  context of the entirety of the document that was the first

18  run.  They recognize they had to fix it, and they did fix it.

19  I think by April 1991 they had achieved this, and it was

20  maintained.  And that's what the record shows.  So they have

21  selected one item out of the context of the document, again,

22  trying to create a genuine issue of material fact in our view

23  and unsuccessfully in our view because it is not a fair

24  reading of the document, and the document establishes this

25  uniform mixing and another definition or alternative

1  definition that it was dissolved in the melt.

2       Okay.  So if we can move now to the method claims

3  just briefly, we've got Claims 13 and 15.  It is the same

4  structure as the product claims, and the processing steps are

5  laid out in these claims that are familiar to Your Honor and I

6  don't think are disputed:  The laser ablation, back exposure,

7  front exposure, and then development of the plate.

8       Where is the evidence?  Again, as an example the Cage

9  Graphics job in May of 1998.  The record shows Dr. Taylor's

10  testimony and the contemporaneous documents that are cited.

11  Some examples are here on the screen is that he used for this

12  customer job 45 DPS plates that had the LAMS layer, the PLS

13  polymer, and the Cronar® base.  So, in other words, the plate

14  in question had the elements, and the record establishes that

15  it had the elements.

16       THE COURT:  I think that what I hear from the other

17  side is that Taylor's invoice or his shipping document from

18  Germany said this batch has -- I'm working from memory now,

19  but correct me if I'm wrong -- this batch has the LAMS one

20  layer, and this batch has the PLS photopolymer, and the

21  documentation from Germany says it is a 45 DPS plate, but it

22  does not say it's got the Blue Base, so Taylor fills that in

23  by saying they all had the Blue Base.

24       MR. OSSOLA:  He knew that.  He testifies --

25       THE COURT:  But then the other side says, you know,

—— Motion - 4/16/13 ——

1   where is your documentary corroboration that this batch had

2   the Blue Base, rather than some other kind of base?

3        MR. OSSOLA:  The record -- Dr. Shock, Dr. Taylor, and

4   the exhibits show that it always had the Blue Base.  The Blue

5   Base was developed in 1991.

6        THE COURT:  Yes, we know there is a Blue Base.  How

7   do we know that it stuck on the bottom of the DPS 45 of batch

8   02-689?

9        MR. OSSOLA:  I think if you look at the record, Your

10  Honor, while the invoice doesn't say that all the other

11  evidence indicates that the DPS plates had the Cronar® base,

12  there isn't anything to contradict that.

13       THE COURT:  So, where is that shown?  You've got J

14  and K that give us the development of the Blue Base back in

15  '91 and '92.

16       MR. OSSOLA:  Your Honor, Exhibit I is the

17  manufacturing record, and I would point Your Honor to that, if

18  I may.

19       THE COURT:  That's the manufacturing spec?

20       MR. OSSOLA:  Yes, the manufacturing spec.

21       THE COURT:  For the plate.

22       MR. OSSOLA:  Correct.

23       THE COURT:  And this particular one happens to have a

24  date of March 5, 1998, that spec.  At the bottom of the first

25  page of it.

Motion - 4/16/13

1          MR. OSSOLA:  Yes, it does, although the final

2    authorization signature was November 1, 1998, but you're

3    right.  The document has stamped "March 5th, 1998."

4          THE COURT:  Okay.

5          MR. OSSOLA:  So this is the -- and the testimony of

6    Dr. Taylor was this was the final manufacturing recommendation

7    that was implemented.

8          THE COURT:  He calls it the recipe.

9          MR. OSSOLA:  The recipe.  You're right.

10          THE COURT:  That is what he calls it.

11          MR. OSSOLA:  You're correct.

12          THE COURT:  This is not a recommendation.  This is

13    the "it."  This is what you have to do.

14          MR. OSSOLA:  That's right.

15          THE COURT:  That's what he says, although it is

16    called a "recommendation."

17          MR. OSSOLA:  But he says -- and it is not

18    contradicted, and he has personal knowledge, and he was

19    actually participating personally on this, and without

20    bringing this up too many times, there is nothing in the

21    record to contradict this.

22          THE COURT:  Okay.  Fine.  So show me where the Blue

23    Base --

24          MR. OSSOLA:  So if you go to page -- if you look at

25    the bottom of the last two digits 531, which is like three or

──────── Motion - 4/16/13 ────────

1    four pages in --

2        THE COURT:  Sure.

3        MR. OSSOLA:  -- it sets forth the plate structure.

4    If Your Honor goes to the top of that page --

5        THE COURT:  Right.

6        MR. OSSOLA:  -- for DPS.  It says -- you have seen

7    this before when I showed you -- "coversheet photopolymer

8    support 45 DPS."  It says, "LAMS/PLS polymer/Cronar® 773 Blue

9    Base."  There it is.  These plates were made with a Blue Base,

10   and this document establishes that they were, in addition to

11   what Dr. Taylor said.  They all had it.  They all had that --

12   that was the Blue Base that was -- that Blue Base was

13   developed by DuPont and was used on all of the DPS plates, and

14   this document confirms it.  It confirms it.  It was said.  I

15   believe it was said by Dr. Shock.  It was said by Dr. Taylor,

16   and this manufacturing record makes clear that that is, in

17   fact, what was done well before the critical date, and, in

18   fact, the period of development here for -- in Exhibit I was

19   '94 through '97, and you can see a couple different plates

20   being developed, but DPS is the only one of concern.

21       I do not believe, with due respect to our opponent,

22   that there is anything that MacDermid can point to that

23   creates a genuine issue of material fact as to whether the 45

24   DPS plates that were sold and that were made publicly

25   contained Cronar® Blue Base.

—————— Motion - 4/16/13 ——————

 1          THE COURT:  All right.  I think that they say,

 2    though, it is your duty to show by clear and convincing

 3    evidence that you had it.

 4          MR. OSSOLA:  It is -- and we certainly don't dispute

 5    that -- but it also is their burden to come forward with

 6    something on summary judgment that would bring that into

 7    question based on the testimony and the manufacturing

 8    documents.  They have come forward with nothing, and when you

 9    think about a trial, I mean it was their burden to come

10    forward -- if they had some other evidence, it was their duty

11    and their obligation, and, surely, they would have brought it

12    forward.  There isn't anything.

13          THE COURT:  At summary judgment the nonmoving party

14    has to come forward with what they've got.

15          MR. OSSOLA:  That's right.

16          THE COURT:  The summary judgment motion is to elicit

17    the counterveiling evidence such as there is.

18          MR. OSSOLA:  And it is striking on this motion there

19    is none on this critical point.  I mean, that is our position.

20          THE COURT:  Fine.  So let's move on.

21          MR. OSSOLA:  Thank you.

22          THE COURT:  And, of course, once we hear from them

23    you and your colleague will get a chance to reply.  So far I'm

24    able to follow your points.

25          MR. OSSOLA:  Well, thank you.  I have achieved

—————— Motion - 4/16/13 ——————

1  something today.

2        THE COURT:  Always do.  I mean, I always have no

3  trouble following your arguments once we all gather together.

4  Both sides.

5        MR. OSSOLA:  Well, with that comment by the Court, I

6  will turn the presentation over so we get into the -- some of

7  the method claims that contain the absorption percentages.

8  I'll turn this over to Mr. Allen.

9        THE COURT:  Okay.  Fine.  Thank you, Mr. Ossola.

10        MR. OSSOLA:  Thank you, Your Honor.

11        MR. ALLEN:  Good afternoon, Your Honor.

12        THE COURT:  Good afternoon, sir.

13        MR. ALLEN:  So before I start I just want to correct

14  one thing I think my colleague slightly misspoke about Exhibit

15  I, if you wouldn't mind.  So, on the date for Exhibit I the

16  signature on the first page that's 11/1/98.  It is our

17  position that that's actually written in the European date

18  format where that should be January 11th, 1998, and that can

19  be seen by if you turn to the last page of Exhibit I, which is

20  314599, the Bates number.

21        THE COURT:  Yes.

22        MR. ALLEN:  The date approved by supervision there is

23  February 8th, 1998.  So this document is well before the

24  critical date, at least February 8th, 1998 when it was

25  approved.

—— Motion - 4/16/13 ——

1          THE COURT:  Okay.  And this fellow who signs it on

2     the front page, what's his name?

3          MR. ALLEN:  Sipkema.  So you'll see that.

4          THE COURT:  Spell it as best you can.

5          MR. ALLEN:  Sure.  It is S-I-P-K-E-M-A.  And if

6     you'll look on that very last page you'll notice on the

7     distribution list he is the first one and the last

8     distribution, E. Sipkema.  And his location is labeled as

9     "NIB," which stands for Neu-Isenberg, Germany.  So he is

10    located in Germany.

11         THE COURT:  Where is the distribution list?

12         MR. ALLEN:  On the last page I had you go to to see

13    the supervision date, 314599.

14         THE COURT:  Sipkema, and that's NIB, Germany?

15         MR. ALLEN:  Neu-Isenberg, Germany.  That's where the

16    plates were manufactured.

17         THE COURT:  So you're saying his signature on the

18    first page is January 11, 1998.

19         MR. ALLEN:  Yes, I think that's the most consistent

20    interpretation if you look at the last page, the signature

21    page, and when this was approved by supervision.

22         THE COURT:  Okay.

23         MR. ALLEN:  So today I'm going to talk to you about

24    two more claim limitations that we have left.  The first of

25    these claim limitations -- and these are both related to the

—————Motion - 4/16/13—————

1   support layer, and they are in seven claims my colleague has

2   not discussed yet -- and that's Claims 16 through 18 and

3   Claims 24 through 27.

4           THE COURT:  Wait a minute.  Just a second, please.

5           MR. ALLEN:  Sure.

6           MR. OSSOLA:  I think we're on Slide 23.

7           THE COURT:  We finished Slide 22?

8           MR. ALLEN:  Yes, Your Honor.

9           So these two additional limitations they both relate

10  to the support layer, again, as you have recognized the

11  dispute.  The primary dispute is all about support layer

12  limitations, and one of the limitations is percent absorption

13  requirements, and the other limitation is a thickness of the

14  support layer requirement.

15          So Slide 23 starts off with the percent absorption

16  requirement, and that is found in two areas in that they claim

17  16 through 18, which they depend from independent Claims 13

18  through 16.  And 16 requires support layer to absorb

19  80 percent to 99 percent of the actinic radiation that's used

20  during the back exposure step.  17 is very similar, just

21  narrows that range a little bit; 85 percent to 95 percent.

22  And then Claim 18 has another special requirement so that the

23  wavelength of your actinic radiation has to be in the range of

24  300 to 400 nanometers.  And then it has to absorb 80 percent

25  to 99 percent of the actinic radiation in that wavelength

—— Motion - 4/16/13 ——

 1   region.

 2           THE COURT:  So, when they're talking about 300 to 400

 3   nanometers, they're saying you have to shine your light from a

 4   certain distance and then measure your absorption rate?

 5           MR. ALLEN:  No, Your Honor.  They're referring to the

 6   wavelength.

 7           THE COURT:  The intensity of the light?

 8           MR. ALLEN:  Not the intensity of the light.  So,

 9   light has a specific wavelength, so the UV light has a

10   wavelength in the region of down in the low 200s, and it goes

11   up to like 430 nanometers, so that's the defined region of UV

12   light.

13           THE COURT:  So they want you to confine your

14   wavelength that you're using when you beam this light to --

15   that's what you're doing is you're beaming light at the

16   support layer, right?

17           MR. ALLEN:  That's exactly correct.  So, yes, you're

18   using a bank of what look like fluorescent bulbs, and they're

19   shining up through the support layer, so this is actually

20   saying you confine what you're measuring to the 300 to 400

21   region because these standard lightbulbs, they actually will

22   emit light a little bit higher than 400 nanometers.  There's a

23   few peaks, but this claim is saying --

24           THE COURT:  Keep your lightbulbs under control.

25           MR. ALLEN:  No, it is just saying whatever you -- I'm

—————————— Motion - 4/16/13 ——————————

1    sorry to interrupt -- it is saying whenever you go to measure

2    how much is absorbed only look at how much light was emitted,

3    and it is between 300 and 400 nanometers and see how much of

4    the light in that region was absorbed.  So it allows for the

5    bulbs to emit light above 400 nanometers, you just don't

6    measure it whenever you're trying to measure percent

7    absorption.

8              THE COURT:  Thank you.

9              MR. ALLEN:  And, so, then the percent absorption

10   limitation also appears in product claim 24, and that's an

11   independent claim.  And from it there are four other -- three

12   other asserted claims 25, 26, and 27.  And, so, they,

13   obviously, as dependent claims, also, would require this

14   percent absorption limitation, and, as you can see, it is

15   pretty simple; a support layer has to be capable of absorbing,

16   again, this 80 percent to 99 percent of the actinic radiation

17   used during the back exposure step.

18             THE COURT:  The sentence above that you say, "Product

19   claim 24 (and its dependent claims) contain same limitations

20   as product claims 30 and 31, but with one additional

21   limitation described in Claim 24."  So the one additional

22   limitation is the 80 to 99 percent range?

23             MR. ALLEN:  Yes.  Yes, Your Honor.

24             THE COURT:  All right.

25             MR. ALLEN:  So, yes, Claim 24 still, for example,

——Motion - 4/16/13——

1   requires an ablation layer and a solid photocurable layer, and

2   the dependent claims from Claim 24 have requirements for UV

3   absorbers, and those UV absorbers being distributed uniformly

4   are those examples, which those appear in Claims 30 and 31.

5           So to determine how much of our Cronar® Blue Base,

6   how much actinic radiation that was actually able to absorb,

7   as you'll recognize in the documentary evidence that we did

8   give you, those documents, unfortunately for us, did not say

9   Blue Base absorbs this much actinic radiation.  At best, they

10  had a value called "UV absorbance."  That was in the

11  specifications sheet that my colleague talked about from 1.93

12  to 2.34.

13          So, to define how much actinic radiation was actually

14  absorbed, our expert acquired a sample of the Blue Base, and

15  the sample that he acquired came from a 45 DPS plate that was

16  retained in the laboratory of Dr. Taylor, who submitted the

17  declaration, and that plate was manufactured around the same

18  time frame, in the 1998 time frame.

19          So you're getting that plate, so that way we can then

20  see -- the purpose of grabbing that plate was to say, all

21  right, we don't have the plates that are used on the plates

22  that were sold in the invoices, but what we can do -- because

23  we're trying to corroborate all the rest of the documentation

24  that's showing, hey, 45 DPS always had Cronar® Blue Base,

25  let's go find something else and corroborate the documentary

———— Motion - 4/16/13 ————

1   evidence.  So that's the purpose of finding this sample and

2   support layer; it was corroborative evidence of the rest of

3   the documents and the way that we can actually physically

4   obtain a sample to measure a percent absorption.

5          So, to make sure that the sample of Blue Base that he

6   acquired was, in fact, a Blue Base, Dr. Henderson, DuPont's

7   expert, tested its UV absorbance, and he found that it was

8   2.25, which was within the specification limits, so --

9          THE COURT:  So, in other words, it was manufactured

10  to spec.

11         MR. ALLEN:  Correct.  That is correct.  So when he

12  found that then he is comfortable saying this sample of

13  support layer is representative of the support layers that

14  were used on the invalidating 45 DPS sales and public uses

15  because they were manufactured in spec.

16         THE COURT:  So then he can go on and test that sample

17  for its absorption range.

18         MR. ALLEN:  Yes.  Yes, that's correct, Your Honor.

19         So the next step he did was then take that, and he

20  applied the infringement methodology relied upon by

21  MacDermid's expert.  For purposes of this motion we're relying

22  on their admitted way, the test for infringement.  So common

23  case law says that which infringes later anticipates as

24  earlier, so relying on their infringement methodology Dr.

25  Henderson determined -- and even the exact same equipment, we

--------- Motion - 4/16/13 ---------

1    went out and purchased what Dr. Kanga used -- found out it

2    absorbed 94.6 percent of the actinic radiation used during

3    back exposure.

4            THE COURT:  That's convenient.

5            MR. ALLEN:  So based on that testing, the expert

6    concluded that the Blue Base -- because the sample was in spec

7    that then the Blue Base support layers that were manufactured

8    in spec he was able to draw the conclusion that they must have

9    absorbed 94.6 percent or some reasonable range thereof, and,

10   therefore, that would invalidate the 85 to 95 percent

11   limitations and the 80 percent to 99 percent limitations that

12   we previously discussed.

13           So that's the percent absorption limitation that

14   applied to Claims 16 through 18 and 24 through 26.  Claim 27

15   also depends from Claim 24, so technically, the percent

16   absorption limitation also follows there, but, as we have

17   shown, we feel the Blue Base there's clear and convincing

18   evidence that that meets the percent absorption limitation.

19           So now moving to Claim 27, it is a dependent claim from

20   Claim 24, and it had one additional limitation, which was the

21   thickness of the support layer.  And that additional

22   limitation is actually unique in this patent because a

23   requirement for the thickness of the support layer does not

24   appear in any of the other asserted claims.  And the required

25   thickness of the support layer in Claim 27, as is clear from

—— Motion - 4/16/13 ——

1   the language, was from about 3 to 5 mils.  So, unfortunately

2   for our position, 45 DPS, even though it met every other

3   limitation of Claim 27, the 45 DPS used the Blue Base, which

4   was a 7-mil thick support layer.  So we're talking about two

5   thousandths of an inch difference between the support layer

6   thickness of the Blue Base was and the claim limitations of

7   Claim 27.

8        So, since the 45 DPS product didn't read literally on

9   Claim 27 our expert had to resort to an obviousness type of

10  analysis and basically asked the question:  Would it have been

11  obvious -- would Claim 27 have been obvious to one of ordinary

12  skill in the art in view of -- in this case the only prior art

13  we're considering is the 45 DPS plate.

14       And, so, to answer that question our expert went

15  through the standard obviousness analysis.  He considered the

16  scope and content of the prior art, as I just mentioned.  The

17  plate used was a 7-mil thick support layer, that was the Blue

18  Base, and the 45 DPS plate, as my colleague previously

19  mentioned was a 45-gauge plate, so either 45 mils or if you

20  want to put it in thousandths of an inch, it was .045 inches

21  thick.

22       And then the difference, obviously, I just mentioned

23  was the only difference between Claim 27 and the 45 DPS plate

24  was the support layer thickness, and then our expert in

25  MacDermid admitted to this in their response to our statement

1    of facts; our expert opined that the level of ordinary skill

2    related to the specific question was that the thickness of

3    your support layer that you use on a plate is related to the

4    gauge of the plate, so the total thickness of the plate.  So

5    thin 45-gauge plates, for example 45 DPS, they typically use

6    7-mil thick support layers.  Conversely, thicker plates like

7    the 67-gauge plate, they typically use 5-mil thick support

8    layers.

9            So the reason that's important after considering that

10   analysis DuPont's expert came to the conclusion that it would

11   have been obvious to one of ordinary skill if he or she wanted

12   to use a UV-absorbing support layer on a 67-gauge plate to

13   look at the Cronar® Blue Base and say, hey, that has good

14   UV-absorbing properties; I can make a 5-mil version of that

15   and use it on my 67-gauge plate.

16           And what we found in DuPont's evidentiary record that

17   supported Dr. Henderson's obviousness conclusion is that one

18   of DuPont's scientists that you have already heard about

19   today, Dr. Shock, he actually developed this idea prior to the

20   critical date.  Dr. Shock had instituted a program to come up

21   with new support layers, new UV-absorbing support layers, and

22   as part of that program whenever they're looking at trying to

23   get new UV-absorbing support layers for 45-gauge plates Dr.

24   Shock came up with the idea, well, while we're doing this, why

25   don't we go make 5-mil versions of UV-absorbing support layers

─ Motion - 4/16/13 ─

1   so that we can use that on certain of our 67-gauge plates that

2   are having some exposure to latitude problems.  And MacDermid

3   has attempted to rebut Dr. Shock's --

4           THE COURT:  So the Claim 27 that requires the support

5   layer of 3 to 5 mils you say would be satisfied by a DPS

6   67-gauger or by a 45-gauge plate with its existing 7-mil

7   support -- no.

8           MR. ALLEN:  Not exactly, Your Honor.

9           THE COURT:  No.  Well, the reason is because we

10  shifted to obviousness now from in use.  What was in use,

11  according to you, was a 45-mil DPS plate that had a support

12  layer of 7 mils.

13          MR. ALLEN:  That's correct.

14          THE COURT:  That's what you had before the critical

15  date.

16          MR. ALLEN:  That's correct, Your Honor.

17          THE COURT:  Okay.  So you're saying it would be

18  really pretty logical to shrink that support layer down to 5

19  mils in the 45-mil plate, and it would work fine.

20          MR. ALLEN:  Our analysis is slightly different from

21  that, that it would have been obvious because a 45-gauge

22  plate -- if you go back to the level of ordinary skill,

23  45-gauge plates typically use 7-mil thick support layers.

24          THE COURT:  Which is what you had.

25          MR. ALLEN:  Which is what we had, but they don't use

———— Motion - 4/16/13 ————

1  5-mil thick support layers, so just shrinking the support

2  layer down to 5 mil and using it on a 45-gauge plate is not

3  the obviousness analysis that our expert undertook because a

4  45-gauge plate would require a 7-mil thick layer.  So, if you

5  shrunk it down to 5 mils, whether or not it would work, I

6  don't know; that's just not what's done in the industry.

7        THE COURT:  So I'm looking right at Henderson's

8  statement here.  It is just saying it would be fine to use a

9  67 -- to make a 67-gauge plate with a 5-mil version of the

10  Cronar®, but you already had that going on.

11        MR. ALLEN:  Not on the 67-gauge plates.  He is saying

12  that if --

13        THE COURT:  The concepts are not difficult.  It is

14  just I'm having trouble understanding what he is trying to

15  say.

16        MR. ALLEN:  Yes, so he is saying what we have in the

17  prior art was the 45 DPS plate that had a 7-mil thick support

18  layer, and that plate's total thickness was 45 mils.  And what

19  was known in the prior art was that if you have a 67-gauge

20  plate it uses a 5-mil thick support layer.  But as of this

21  time there were no 5-mil thick UV-absorbing support layers

22  that we're aware of.  So what Dr. Henderson is saying that --

23        THE COURT:  No 5-mil thick support layers attached to

24  45 mil --

25        MR. ALLEN:  Are attached to 67-mil plates.

 1              THE COURT:  Or even attached to 67?

 2              MR. ALLEN:  Right.

 3              THE COURT:  Okay.  So it would have been obvious to

 4   put a 5-mil Cronar® Blue Base on a 67-gauge plate.

 5              MR. ALLEN:  Yes, Your Honor.  It be would have been

 6   obvious to create a 5-mil Cronar® Blue Base and then put it on

 7   a 67-gauge plate or something similar to that, which is what

 8   Dr. Shock -- the idea he came up with prior to the critical

 9   date was while we're making these new UV-absorbing support

10   layers, let's make a 5-mil version and put that on certain of

11   our 67-gauge plates.

12              THE COURT:  Okay.  I get it.  And these claims that

13   we're talking about here, Claim 27 and its independent claim.

14              MR. ALLEN:  Claim 24, Your Honor.

15              THE COURT:  Right.  Wouldn't care if this 5-mil

16   support layer is on a 67-mil plate.

17              MR. ALLEN:  Yes, Your Honor.  The claims aren't

18   limited -- they have no limitations directed to the thickness

19   of the plate, the total thickness of the plate.

20              THE COURT:  Okay.  Okay.

21              MR. ALLEN:  So just in quick conclusion to wrap up

22   both what I have talked about today and what my colleague, Mr.

23   Ossola, talked about, we feel that summary judgment of

24   invalidity on all of the asserted claims is warranted because

25   DuPont has presented clear and convincing evidence on both

───── Motion - 4/16/13 ─────

1   that a sale took place, that a public use took place, and that

2   the 45 DPS plate and its method of use embodied all claim

3   limitations in the asserted claims.

4        And, again, we feel that MacDermid has not come forward

5   with any evidence demonstrating a genuine issue of material

6   fact.  At best, they have made conclusory attorney arguments

7   or misrepresented certain quotes or taken them out of context

8   of the documents in the record before you.

9        THE COURT:  Okay.  Well, I'm going to listen to the

10  other side, but I definitely will be asking how does your

11  obviousness analysis that supports your attack on Claim 27 fit

12  under 102(b), and for that you're going to argue, well, you

13  know, it would be the same thing if you look at it under 103,

14  so to that degree we're expanding this motion just to attack

15  Claim 27 under 103, obviousness.

16       MR. ALLEN:  Would you like me to address the point

17  now?

18       THE COURT:  You can get started, and I'll let you do

19  more.

20       MR. ALLEN:  Certainly.  Sorry to interrupt you again.

21       So this is a special case, and we have relied on clear

22  case law, TorPharm and In Re: Smith, that talk about whenever

23  you have a prior art product or a prior art use under the

24  102(b) context that if there is a limitation that is not met

25  by that prior art product -- so for this example a support

—Motion - 4/16/13—

1  layer thickness -- that the 102(b) analysis can be extended to

2  capture that extra limitation, and the analysis you apply --

3  and it is clearly laid out in In Re: Smith -- is that you ask

4  was it obvious that additional claim limitation, was it

5  obvious in view of the alleged prior art product?  So, here,

6  was Claim 27 obvious in view of the 45 DPS product?

7        So that question -- the analysis you have to undergo is

8  identical to if you were to read 35 U.S.C. 103, that question

9  there is whether the claimed invention is obvious in view of

10  the prior art.  So our position is we went through the

11  obviousness analysis, and I just walked you through how Dr.

12  Henderson, he considered the scope and content; that's the 45

13  DPS plate.  That's the only prior art that's at issue in this

14  specific analysis.  As Mr. Ossola talked about earlier, we do

15  have other obviousness arguments, but they're not at issue in

16  this summary judgment motion.

17        THE COURT:  You're just asking me to look at this one

18  argument about obviousness?

19        MR. ALLEN:  Yes, just this one argument about

20  obviousness and the only prior art that's at issue that we

21  alleged renders this claim obvious is 45 DPS; that in

22  combination with the level of ordinary skill in the art that

23  MacDermid has admitted to.

24        THE COURT:  Has In Re: Smith had a life after 1983?

25        MR. ALLEN:  TorPharm cited it, and that was --

———————— Motion - 4/16/13 ————————

1          THE COURT:  That's 2003.

2          MR. ALLEN:  Yes, I believe that's correct.

3          THE COURT:  Okay.  All right.

4          MR. ALLEN:  Just one additional point.  TorPharm,

5   just so you're clear, it talked about this 102(b)/103 bar to

6   patentability and basically said whether you consider a case

7   of the 102(b) bar or the law of obviousness that the analysis

8   is the same, and that's the analysis that we applied under In

9   Re: Smith, the obviousness-type analysis.

10         THE COURT:  But it is only when you are already

11  fairly well advanced in a 102(b) analysis of an overall group

12  of patent claims and a particular on sale in use product or

13  method, right?

14         MR. ALLEN:  Yes, Your Honor.  We believe it is

15  limited to that specific circumstance.

16         THE COURT:  Cleaning up the last few details.

17         MR. ALLEN:  Yes, Your Honor.  I think that's a good

18  way to put it.

19         THE COURT:  We'll have to see.

20         MR. ALLEN:  Do you have any further questions?

21         THE COURT:  No.

22         MR. ALLEN:  Thank you, Your Honor.

23         THE COURT:  Thank you very much.

24         MS. O'REILLY:  Your Honor, may we have a copy of

25  MacDermid's presentation?

———— Motion - 4/16/13 ————

*1*          THE COURT:  Yes.

*2*          MR. HORVACK:  Your Honor, I'm all set.

*3*          THE COURT:  We should take a five-minute break.

*4*          MR. HORVACK:  Yes, I go much faster than they do, but

*5* a break would be fine.

*6*          (Break taken from 3:35 to 3:45 p.m.)

*7*          THE COURT:  Back in session.

*8*          MR. HORVACK:  Thank you, Your Honor.  As you know, my

*9* name is John Horvack.  I would like to address a couple of the

*10* preliminary issues that you spoke to Mr. Ossola about quickly

*11* and then move on to the prepared presentation.

*12*     First is with respect to the motion to strike that's

*13* with the Magistrate, those matters solely relate to the other

*14* case, DuPont versus MacDermid.  There's no motion to strike

*15* issue related at all in this case, and, so, those matters are

*16* wholly distinct from this particular case.

*17*     Second thing is, you raised the issue with him about

*18* arguing obviousness or whether there's a motion for summary

*19* judgment that they will file with respect to obviousness

*20* beyond what's here.

*21*          THE COURT:  You raised it in your brief; they didn't

*22* respond.

*23*          MR. HORVACK:  That's right.  And the scheduling order

*24* for this case required motions for summary judgment to already

*25* be filed, and, so, to the extent that the scheduling order is

──── Motion - 4/16/13 ────

1   binding and an order of this Court, as it should be, they have

2   no opportunity now to file any further motions for summary

3   judgment.  So this is the last pending motion.  If it is

4   denied, we should move as expeditiously to trial as possible,

5   given the Court's schedule.  So those are the preliminary

6   notes.  I believe that there's four separate legal issues to

7   talk about.

8           The first is whether or not there's written

9   corroboration with respect to their claim about DPS 45.  That

10  comes from the <u>Barbed-Wire</u> case from 120 years ago, and it

11  continues until today, and we'll talk about that in some

12  detail.  In short, they need to provide written corroboration

13  with respect to each and every precise limitation in the

14  claim, and there's very good reasons for that.

15          The second issue is whether or not, given the overall

16  record under the Rule of Reason a juror, a reasonable juror

17  could not find in their favor.  I submit that given the

18  credibility issues at stake in this case, the issue is one

19  squarely for a jury to decide.

20          The third issue is unique to method claims, and I

21  believe with all due respect to my colleague on the other side

22  he misquoted and misrepresented the law with respect to method

23  claims.  <u>W.L. Gore</u> in 1982, I believe, made it very clear that

24  in order for a method claim to be in the public domain all

25  aspects need to be known with respect to the process, which

—Motion - 4/16/13—

1  would include here the various dynamics of the plate; how it

2  was made, what's in it, and how it was ultimately processed.

3  Those things, I submit, if you look at this plate, would be

4  unknown to anybody in the world.

5        The fourth, rebuttal to Claim 27 in this alleged

6  102/103 bar.  It doesn't exist.  It is a patent office

7  convention.  It is not a convention that's used in court.  We

8  know what the principles of obviousness and 102 bar are in

9  courts, and, so, I think that set of arguments are going to

10  fail legally, as well.

11        So, going back to the beginning, and I will go very

12  fast --

13        THE COURT:  Well, I wouldn't force you to, you know

14  that.

15        MR. HORVACK:  You know this and, so, I'm going to be

16  expeditious.  You know that this patent relates to efficiently

17  creating high quality flexographic printing plates.  And it

18  does that by tuning the plate at the manufacturer by design,

19  so that if it goes anywhere in the country it can be created

20  even by lawyers with great efficiency and great precision.

21        THE COURT:  Impossible.

22        MR. HORVACK:  Well, yes, I could have included

23  judges.

24        THE COURT:  Also impossible.

25        MR. HORVACK:  Could be.  Every layperson who has some

—————— Motion - 4/16/13 ——————

1  skill at all would be able to create with precision and

2  preciseness and repetition a high quality plate given the

3  teachings and claims of this particular patent.  As you have

4  gone through, there's product claims and method claims, and

5  the record is clear there's 13 different DuPont products which

6  infringe all of those.

7        I put "sole defense."  Sole defense as it remains here

8  with respect to summary judgment is this unique not often used

9  defense of first inventorship, that they created the claims of

10 the '835 patent, not MacDermid.  It's a unique defense because

11 often an inventor, a creator, an innovator -- DuPont claims to

12 be all of those -- if they truly did invent these claims, they

13 would have put it into the patent office, they would put it

14 into the public domain clearly, squarely, with precision

15 contemporaneously, and I submit to you that all of those

16 things are lacking here.

17       Technology.  Very, very fast.  You know that analog

18 plates and digital plates are sandwiches.  They're not

19 terribly different from each other.  The plates' basic

20 construction is the same, except for the LAMS layer, which is

21 doped with a carbon block, and the method of use is subtly

22 different as a result.

23       Digital plates ablate with a digital laser,

24 computer-guided laser.  The mask actually is in the plate

25 itself; that is not true for analog.  In analog there's a

—————— Motion - 4/16/13 ——————

1   separate photo tube put on top.

2        Step two is back exposure.  A floor is created with UV

3   light being shown through the back of the supports.  Front

4   exposure, which then creates the relief areas by leaving

5   uncured and cured areas.  And then a development means, as you

6   know very well, there are four, including thermal, as well as

7   alternative, optional others that have been known for decades.

8        For our purposes there's a significant difference

9   between digital and analog, even though most things are the

10  same.  So because the in situ mask is actually part of the

11  plate element, a vacuum is not required to image the plates.

12        THE COURT:  And you don't have to stick it in a

13  vacuum chamber.

14        MR. HORVACK:  That's right.  And suck down the

15  phototool like you do with analog.  And, so, with digital you

16  have imaging done in the presence of oxygen.  Oxygen has a

17  chemical and physical effect which slows down the curing

18  process.  So both analog -- excuse me, so both the back and

19  the front exposure of a digital plate is slower than with

20  analog if everything else is constant.  Just by the simple

21  dynamic of oxygen.

22        So in the art it was determined that speeding up the

23  photo speed of the plate itself was a very good idea because

24  you didn't want unduly long front exposure times, which would

25  be inefficient for customers.  When you did that, however, the

—— Motion - 4/16/13 ——

1  back exposure times became undesirably short.  And that was

2  recognized for the first time by Dr. Kanga.  Dr. Kanga

3  determined that short back exposure times cause unpredictable

4  floor depth.

5          THE COURT:  It made a messy floor.

6          MR. HORVACK:  And an unpredictable floor.  Sometimes

7  it would work and other times it would not because the short

8  exposure times did not give good latitude in back exposure.

9          To fix that, the solution was to employ this especially

10  designed support layer of the '835 patent.  They have gone

11  through many of these elements, and I won't repeat them much,

12  but I note that they're very precise, particularly in view of

13  your claim constructions, particularly as it relates to

14  actinic radiation.  And in order to invalidate all of these

15  claims they need written corroboration to satisfy each of

16  these precise elements.

17          So their motion.  The product claims are invalid

18  because of three sales, three sales only:  Banta, Banta, and

19  Cage.  Method claims they say are invalid because they

20  internally -- Dr. Taylor and his team -- processed the plates

21  and then sent the finished plates to customers.  And then they

22  claim 27 is invalid because of this unique 102/103 bar.

23          Basics.  There's a presumption of validity.  They

24  have the burden at trial for proving it invalid by clear and

25  convincing proof.  And on summary judgment, importantly, if

─────── Motion - 4/16/13 ───────

1  there's any reasonable doubt, if a reasonable juror can find

2  otherwise; i.e., they didn't meet the clear and convincing

3  hurdle, it must be denied.  Those are the basics.

4       Here, however, as I noted, it is unique and different

5  because according to the U.S. Supreme Court from 1892 these

6  types of defenses are inherently suspect.  When an alleged

7  infringer says later that they have invented the claimed

8  invention to get out of their infringing activity great

9  skepticism from the courts have been put on those types of

10  defenses.  Here involved in the Barbed-Wire case, they have 24

11  witnesses, including a deputy-marshal that said that the

12  alleged infringer had a fence -- that the Morley fence was at

13  the fair, and, actually, another witness, Mr. Potter, produced

14  a specimen that he claimed was from that fence, and he

15  produced it at trial.  He, apparently, had it in his bag of

16  tricks at home.  They brought it in.  The District Court

17  credited it.  The Circuit Court affirmed it, and the Supreme

18  Court said, Wait, one minute.  What you have is not acceptable

19  from its perspective because of the reasons stated here.

20  Forgetfulness of witnesses, their liability to mistakes, their

21  proneness to recollection things as a party calling them would

22  like them to recollect it, aside from the temptation to actual

23  perjury.

24       So as of 1892 the defendant needs proof that is

25  clear, satisfactory, and beyond any -- a reasonable doubt.

—————— Motion - 4/16/13 ——————

1            THE COURT:  Can't be beyond a reasonable doubt.

2            MR. HORVACK:  If there's a doubt --

3            THE COURT:  I'm saying beyond a reasonable doubt is

4    not the modern standard.  Clear and convincing is the modern

5    standard.

6            MR. HORVACK:  I agree.

7            THE COURT:  Thank you.

8            MR. HORVACK:  If there's a doubt, however, for this

9    particular defense, that doubt, particularly at summary

10   judgment, needs to go in favor of the patent holder.  And, so,

11   they concluded, we think the doubts that they entertained

12   about who actually invented this should be resolved in favor

13   of the patentee.  I believe the Federal Circuit has said

14   that's right.  And, by the way, in modern times because of the

15   ubiquitous paper trail created by virtually all commercial

16   activity, it is particularly applicable in modern times.  And,

17   of course, DuPont creates lots of paper.

18           So uncorroborated oral testimony is not acceptable as

19   a matter of law, says the Federal Circuit.

20           The cases that I think are must reading for Your

21   Honor are the Barbed-Wire case, which we went through, as well

22   as Lacks Industries, which says while there's some documents

23   that do in some respects corroborate the oral testimony, those

24   documents were too incomplete or contradictory.  In fact, they

25   failed to meet certain precise elements of the asserted

—— Motion - 4/16/13 ——

1   claims, and, therefore, the defense had to fail.  Same thing

2   in Juicy Whip.

3           THE COURT:  How come you're not moving for summary

4   judgment of your sole --

5           MR. HORVACK:  Well, I believe -- well, there's

6   a number of strategic --

7           THE COURT:  It is hard to get summary judgment --

8           MR. HORVACK:  It is.  There's a --

9           THE COURT:  -- as a plaintiff.

10          MR. HORVACK:  I agree.  There's a number of strategic

11  reasons why we did not --

12          THE COURT:  I don't need to know.  Move on.

13          MR. HORVACK:  Second, or in addition, the DuPont

14  cases they cite actually prove this very precise and important

15  requirement.  In the three cases that they cite there's

16  actually contemporaneously created documents which fully

17  fulfilled all of the claim requirements.  Here I submit there

18  is none of that.

19          So, as it relates to this accepted, well-known, and

20  very important requirement of written corroboration for each

21  precise claim element I have gone through the record and I

22  found 10 reasons where they have failed to meet that important

23  standard on summary judgment.

24          The first is with respect to the invoices themselves.

25  It appears, according to the invoices themselves, what they

1   have sold is a 45 DPS EX plate.  As Mr. Ossola indicated,

2   these sales were very early on in the development of digital.

3   And, apparently, they were EX plates, experimental plates.

4        In their reply they have suggested that this is some

5   sort of cutoff of what is really in the first sentence EXP DD.

6   They do that with lawyer argument only.  There's absolutely no

7   evidentiary support for that whatsoever.

8        THE COURT:  Taylor was happy with it.  Taylor was

9   happy with it.

10        MR. HORVACK:  Dr. Taylor, with all due respect, did

11   not speak to this issue of EX.  Mr. Ossola in his presentation

12   indicated that he did.  I would welcome Your Honor to go to

13   his declaration and see that he did not refer to "EX."  What

14   he did explain --

15        THE COURT:  I didn't dream it.

16        MR. HORVACK:  What he did explain was what "EXP/DD"

17   is.

18        THE COURT:  Yes.

19        MR. HORVACK:  Right.  I'm focused on the next line,

20   which indicates it is 45 DPS EX.  Their explanation, by lawyer

21   argument only, is that's a cutoff of EXP DD.  There's no

22   evidence that that is a cutoff, except their lawyer argument.

23        THE COURT:  Well, didn't Taylor tell us -- and

24   forgive me, but I'm thinking along as you make these

25   arguments -- Taylor told us that the second line under the

—— Motion - 4/16/13 ——

1   first line of the invoice is the same item just expressed in

2   centimeters.

3        MR. HORVACK:  He did, but he did not --

4        THE COURT:  It is the same item then EXP/DD describes

5   the item in line 2 just as well as it describes the line item

6   1.

7        MR. HORVACK:  I think that's one fair, reasonable

8   jury interpretation of this.  The other fair, reasonable jury

9   interpretation of this is that this is an experimental plate,

10  and, again, there's no evidence that the 45 DPS EX is a cutoff

11  version of what's above.  He did not speak to that issue of

12  EX, number one.  Number two, if there's a reasonable

13  interpretation here it needs to go in favor of MacDermid, not

14  DuPont.  And I particularly say that, given that there's no

15  evidentiary record from them whatsoever, and the issue was

16  posed by them first in reply only, not in their opening brief.

17       So I believe reason for denial number one you can end

18  the inquiry right now and indicate that they corroborated no

19  sales, except for an EX, a reasonable, fair interpretation of

20  the invoices.

21       THE COURT:  Have you got an invoice from -- any kind

22  of a shipping document from Germany to Wilmington for batch

23  069 and the other one?

24       MR. HORVACK:  There's no such thing in the record.

25  The other thing that's notable here is that there are stock

--- Motion - 4/16/13 ---

 1  numbers that are attached to each sale here.  For the first

 2  one it appears to be 9872550012.

 3          THE COURT:  I'm sorry.  I have lost you.

 4          MR. HORVACK:  On Page 23 there's a stock number to

 5  the left.

 6          THE COURT:  Just a second, counsel.

 7          MR. HORVACK:  Page 23.

 8          THE COURT:  Of what?

 9          MR. HORVACK:  Of the PowerPoint.  It says "Reason for

10  Denial."

11          THE COURT:  Mine does not have page numbers.

12          MR. HORVACK:  If you go right here, Judge.  Sorry.

13  It is in a unique place.  Sorry about that.  You're right.

14          THE COURT:  Okay.

15          MR. HORVACK:  On this particular page there's always

16  a stock number, it appears, attached to these --

17          THE COURT:  I see stock number.

18          MR. HORVACK:  So the second reason for denying their

19  motion is that according to their own testimony these stock

20  numbers can be tied to inventory records, which are tied to

21  manufacturing records.  They can trace back where it was made,

22  which would be tied to formulation records and particular

23  procurement records for the materials that are put into these

24  batches.  And as it relates -- and there's testimony to that

25  effect.  We put it into the record here on Page 24.  Their

—Motion - 4/16/13—

1   expert conceded the same thing on Page 25.

2        And, so, on this important issue with respect to these

3   very precise sales, three of them before the critical date,

4   they have failed entirely to produce any of the documents that

5   are attached specifically to these products.  So, again,

6   there's stock numbers, which go to inventory records, which go

7   to manufacturing records, which go to formulation records.

8   They have produced nothing as it relates to these particular

9   plates that were sold on these particular dates to these

10  particular customers.  And without that contemporaneous record

11  we don't know what these plates are, these 45 DPS EXP DDs to

12  45 DPS EX, whatever you want to call them.  Whatever they are,

13  we don't know, based on DuPont's own records, what they are.

14  And that's curious according to the Supreme Court and the

15  Federal Circuit in Woodland Trust because there is a

16  ubiquitous paper trail created by companies, particularly

17  global companies who tout themselves as one of the greatest

18  industrial companies in the world.

19        THE COURT:  You are not suggesting a more stringent

20  standard for DuPont than for other challengers.

21        MR. HORVACK:  No, I'm simply noting what the law says

22  with respect to commercial endeavors in our time, and I do

23  note --

24        THE COURT:  Do you need a complete paper trail in

25  order to satisfy Woodland?  They say "ubiquitous," but that

1    just means everybody has a paper trail.  They don't say what

2    paper trail.

3            MR. HORVACK:  No, I agree.  It could be a formulation

4    record.  It could be a manufacturing record.  It could be a

5    combination of both, but it needs to be contemporaneous, and

6    it needs to be tied to the sales.  And it needs, as I said

7    earlier, to precisely satisfy the claim elements, all of them.

8    There needs to be an identity between what was sold and

9    written, contemporaneous proof of that and what the claims

10   are.  Without that, the patentee wins according to the law.

11   And that makes sense.  It is the patentee, obviously, that put

12   this into the public domain.  It is the patentee who clearly

13   invented this.  It is the patentee who has pushed the

14   innovative envelope.  It is the alleged infringer, the one who

15   now 15 years later is saying, Whoa, wait a minute, I don't

16   have any documents that are patents, I don't have any

17   contemporaneous writings about what I did, but, really,

18   believe me, Judge, I invented it first.  In those

19   circumstances the law quite clearly and quite rightly in my

20   view says we're not going to allow that to happen.  The

21   patentee with the written patent prevails.  And at a minimum,

22   Judge, this is a jury question, not one that you could resolve

23   on summary judgment.

24           The third reason for denial is, I believe, what you

25   focused on during DuPont's presentation, which was a clear

1  focus on the support layer.  The innovations here clearly

2  relate to the support layer and its importance to the digital

3  format.  And, again, we have confirmation from DuPont itself

4  that it created paper trails with respect to this Cronar®

5  support.  And we have quoted that here and here as it relates

6  to the formulation.  What is notably lacking is roll numbers

7  for the Cronar® support that were attached to these plates,

8  whether it is 45 DPS or 45 DPS EX, what the chemical

9  properties were, what the optical properties were, how it was

10  formulated.  Nothing.

11          THE COURT:  We have a spec as to how it is supposed

12  to be formulated.

13          MR. HORVACK:  From 1991.

14          THE COURT:  It never changed.

15          MR. HORVACK:  That's not true.  So, first of all --

16          THE COURT:  I don't want you to lose your train here,

17  but you're whipping through these slides so fast I can't read

18  them.

19          MR. HORVACK:  Oh, sorry.  Okay.  So with respect to

20  27, while you're reading it I'll just tell you it confirms

21  from their 30(b)(6) deponent that a paper trail was created

22  with respect to the creation of Cronar®, and particularly as

23  relates to what support layer was put on what plates.

24          And, so, again, what's lacking here is some

25  confirmation of what the actual support was on these

—— Motion - 4/16/13 ——

1  particular plates that were sold on these three occasions.

2  So, yes, indeed, there is a spec from 1991.  There's a

3  research paper from 1992.  None of those say that these --

4  that Cronar® was going to be put on these plates, which were

5  going to be created five or six years later.  It says we have

6  Cronar®, and it is being used elsewhere, but there's nothing

7  that ties it to the manufacture and sale of what they say

8  invalidates these claims.  And --

9        THE COURT:  They say that's all they had, so that's

10  what we used.

11        MR. HORVACK:  But here you see on Page 27 that they

12  created other records.  So if they created other records in

13  the ordinary course, they should be -- if it were true -- able

14  to corroborate it.  They have produced nothing on these

15  important, critical, key points.  Without written

16  corroboration for the precise elements, the motion needs to be

17  denied.

18        Fourth is simply that their own 30(b)(6) deponent

19  doesn't know the formulation of Cronar® as it relates to the

20  alleged invalidating sales.  Well, if that person who should

21  know does not know, then this Court can't possibly know the

22  formulation, and, therefore, invalidate these claims.

23        So, getting to your points, Judge, instead of producing

24  what one would expect, formulation, manufacturing, quality

25  control records keyed to these particular sales which -- which

— Motion - 4/16/13 —

1   is their defense, they go back five or six years to a

2   procurement record, some specs from 1991, and a research

3   report from 1992.  But, again, please note that the sales

4   occurred in '97 and '98.  These are not -- on the face of it

5   these are not contemporaneous records at all, number one.

6        And, number two, their corporate representative did

7   testify that the way in which Cronar® was made, the

8   manufacturing process, did change over time.  He didn't know

9   how or why or in what respects, but he knew it changed.  And,

10  so, if we have change --

11        THE COURT:  Let's look at that testimony for a

12  second.

13        MR. HORVACK:  Sure.

14        THE COURT:  MPS Exhibit A.  Which one is that?

15        MR. HORVACK:  Exhibit A.

16        THE COURT:  Yes, but who is that?

17        MR. HORVACK:  It is attached to our exhibit, Judge.

18        THE COURT:  MPS.  Okay.  Just a minute.  I'm there.

19  I'll tell you when I have found the page.

20        MR. HORVACK:  In particular, Judge, if you went to

21  Page 80, Line 13 --

22        THE COURT:  Yes, that's where I am now.

23        MR. HORVACK:  So he says, "There's a continuously

24  improved process to improve the performance of the layer."

25  And he goes on --

─────── Motion - 4/16/13 ───────

1          THE COURT:  So it's mostly process related.

2          MR. HORVACK:  That's right.

3          THE COURT:  But the formulation always had Tinuvin®

4    900 and blue dye in them.

5          MR. HORVACK:  Right.  But he didn't know the exact

6    formulation of that layer.  So, okay, it has got Tinuvin® and

7    it has got blue dye.  What else does it have and what

8    percentages are each?  And, further, we have, again, process

9    changes which could very well change the optical outcome of

10   these particular plates.  Again, all of this is assuming that

11   Cronar® was on these DPS plates.

12         THE COURT:  And then on Page 82 you ask:

13   "Did the amount of Tinuvin® 900 in the Cronar® ever

14   change prior to the critical date?"

15         And he says, "I can't be certain.  We had goals.  We

16   had a specification right from the beginning of that product,

17   and I think that remained pretty much throughout for

18   absorbance at 350 nanometers.  I think it was something like

19   1.93 to 2.34 absorbance at 350 nanometers.  So, it was always

20   their task to keep the product in that range, but I'm not sure

21   whether they had to vary the amount of Tinuvin® to do that."

22         "But as far as you know the specification at 350

23   nanometers never changed from DuPont's perspective?"

24         "Not that I'm aware of."

25         MR. HORVACK:  Right.  So I agree with your

1  interpretation of all of that.  We have got potential process

2  changes to allegedly improve the process.  We have got

3  potential formulation process changes, the actual amount of

4  materials going into this, but it appears consistent that he

5  has a wide spec of 1.93 to 2.34 absorbance at 350 nanometers,

6  and it is important to recognize what that means.  That's not

7  percent absorption, and it is at a very precise wavelength, so

8  the actinic radiation that's called out in the claim,

9  remember, your construction was it is the -- it was the

10 wavelength which created a change in the material.  That is

11 not at one precise wavelength 350, and then there's a

12 dependent claim, which I think is 18, which calls out a very

13 precise nanometer range 300 to 400.  It is not at the precise

14 350.

15         So these values are meaningless to the claims at issue,

16 and, in fact, I believe there's a concession that if you look

17 at this you can't easily translate these values into the claim

18 limitation values, and what they did was they gave a plate to

19 their expert to recreate some examples or some testing, and

20 I'll talk about that further.  My basic point here is that

21 rather than giving records of what was actually on these

22 plates, what the support layer was, how it was made, what was

23 in it and what the optical properties were vis-a-vis these

24 claims, they're going back years, and during those years we

25 have got changes, which we don't know how they affect the

—————— Motion - 4/16/13 ——————

1   optical properties, which are critical to the claims that are

2   at issue.  And since it is their burden to provide written

3   contemporaneous corroboration to prove their defense by clear

4   and convincing proof -- not beyond a reasonable doubt, but by

5   clear and convincing proof -- it fails for those reasons.

6          Six, the specification for Cronar® that they point

7   to, which is Exhibit J, which I believe is from 1991, actually

8   says that the blue adhesive -- the blue adhesive coating is

9   what has the UV-absorbing material in it, and it is for

10  antihalation purposes.  What the claims require, however, is

11  that the actinic radiation absorbing material or compound must

12  be in the support itself.  And Your Honor may recall that --

13         THE COURT:  Did you ask anybody whether this means

14  that the coating, whether the adhesive coating contains the UV

15  absorber, leaving aside for antihalation purposes.

16         MR. HORVACK:  I don't recall, Judge.

17         THE COURT:  Because I don't know that you did.  The

18  blue adhesive coating polyester film with a UV absorber for

19  antihalation.  You can read it either way.  It does not

20  necessarily mean that the adhesive coating has the UV

21  absorber.  It can easily be read the blue film has the UV

22  absorber, and the adhesive helps you to stick it on to the

23  upper layer.

24         MR. HORVACK:  I don't know if that's the best

25  interpretation.  I suppose it is one interpretation, I would

—— Motion - 4/16/13 ——

1    say, though, in contrast to that, it is describing the blue as

2    the adhesive, and it is the blue portion that has the UV

3    absorber, as you have established with my esteemed colleagues,

4    and, so, I believe the better interpretation -- and,

5    certainly, for summary judgment purposes, a reasonable

6    interpretation is this old 1991 spec sheet for raw materials

7    is describing an adhesive that has the UV absorber in it.

8         THE COURT:  I can diagram that sentence for you, and

9    the only reasonable interpretation of that is "blue" and

10   "adhesive-coated" modifies the noun "film."

11        MR. HORVACK:  Agreed.

12        THE COURT:  Fine.

13        MR. HORVACK:  I agree with you.  I agree with that.

14   So I would construct it and diagram it the same exact way.  It

15   is where the UV absorber, which comes back to --

16        THE COURT:  Which modifies "film" not "adhesive."

17        MR. HORVACK:  Well, okay.  English grammar may have

18   that interpretation.  I would say here where it says, "blue

19   adhesive," and we know the UV absorber is blue because Dr.

20   Henderson has told us that, it is the coating on the film that

21   has the UV absorber because that's the blue part.  So I

22   understand your interpretation.  My interpretation says "blue"

23   means UV absorber, go see Dr. Henderson, number one.  Number

24   two, it is for antihalation purposes.  We know according to

25   the patent at issue that antihalation was for analog plates

─ Motion - 4/16/13 ─

1  because it was dealing with a front exposure problem.  And we

2  know that in the prior arts, adhesive coatings on the support

3  dealt with that problem.  And, so, for all of those reasons

4  that is entirely distinct and different than the claimed --

5          THE COURT:  And tell me again, I seem to have a

6  mental block for antihalation.

7          MR. HORVACK:  Sure.  So for front exposure, there's

8  the -- I can go all the way back, I suppose.  For front

9  exposure --

10          THE COURT:  Of an analog plate.

11          MR. HORVACK:  Right.  Well, assume that there's no

12  black here, and we're -- what we have here is a --

13          THE COURT:  You have got a photo negative.

14          MR. HORVACK:  Yes.  Assume that, okay?  And there's a

15  release layer in there, as well.  What happens is that the

16  light comes down and will actually bounce off of the interface

17  between the photocurable or the photopolymerizable layer and

18  the support.  It will bounce, and it will actually come into

19  the areas in which it needs to stay uncured or not hardened,

20  so it is doing a bad thing.  It is bouncing, and it is coming

21  back up and curing what should remain uncured.

22          And the effect of that is it creates a halo around the

23  base of the support, which will improperly raise the total

24  relief of this, which will distort what you actually want to

25  print.

—— Motion - 4/16/13 ——

1          And, so, what they did, what this 1991 spec sheet is

2    describing is they put a coating on top of the support layer,

3    which did have a UV absorber in it, a blue adhesive, and it

4    would capture -- it would capture the front exposure UV light

5    and not allow to it bounce back up.  It would get captured in

6    the support adhesive layer on top of it and not give you -- it

7    would prevent halos, and, therefore, it was antihalation.

8               THE COURT:  Oh, halo, halation.  Light rays.

9               MR. HORVACK:  Right.

10              THE COURT:  And that is for your analog deal,

11   correct?

12              MR. HORVACK:  Correct.  That's right.

13              THE COURT:  You'll have to refresh me on this.  Is

14   antihalation a concept that you need to deal with when you are

15   doing a digital process?

16              MR. HORVACK:  I think the answer is theoretically,

17   yes.

18              THE COURT:  Still?

19              MR. HORVACK:  Yes.  Because you're doing front

20   exposure, and instead, you're going through an in situ mask as

21   opposed to a phototool in the release layer, and you might

22   have the same phenomenon.

23              THE COURT:  So it deals with front exposure of the

24   plate.

25              MR. HORVACK:  And it does not deal with back

1   exposure, which is the focus of the claims at issue.  And, so,

2   when it talks about an adhesive that's blue for antihalation,

3   and we know the UV absorber is blue, I believe the best, and,

4   certainly, a reasonable interpretation of this is that it has

5   absolutely nothing to do with the patent at issue.

6          Secondly, and I touched upon this briefly, reason

7   number seven focuses on this entry of the spec having a UV

8   absorbance at 350 nanometers with values 1.38 to 2.3 or so.

9   So your claim construction with respect to actinic radiation

10  is not at 350 nanometers.  It is the actinic radiation waves

11  which create a change in this very complex photocurable layer,

12  number one.  And, number two, as relates to Claim 18 in

13  particular, we have got a call-out of a precise range of 300

14  to 400 nanometers.  That is different, obviously, than the 350

15  nanometers spec here.

16         THE COURT:  350 is more precise than 300 to 400.

17         MR. HORVACK:  It totally is, but you get different

18  values since you're looking at a broader range.

19         And then finally --

20         THE COURT:  In the patent.  300 to 400 gives you a

21  different range of readings.

22         MR. HORVACK:  You're looking at a broader in

23  different range than the precise 350.  So that's two.  The

24  final point is these UV absorbance values, as Mr. Ossola, I

25  believe said, are logarithmic and they don't translate to

—————— Motion - 4/16/13 ——————

1   UV-absorption values that we have in the '835 patent.  And,

2   so --

3           THE COURT:  You have an expert to check that and then

4   subject that article to other testing?

5           MR. HORVACK:  Yes.  With respect to the points that I

6   made, I believe there's been concessions in open court today

7   about them, so these particular values do not translate into

8   what's at issue in the patent limitations.

9           THE COURT:  Not without an expert.

10          MR. HORVACK:  And they have an expert, and they

11  haven't translated them at all.  And if I go further --

12          THE COURT:  You're quite convinced in your head, but

13  you're not getting through to me.

14          MR. HORVACK:  Oh, okay.  Well, if you just look at

15  it, Judge, you see it is UV absorbance, so what the claims

16  relate to is percentage of actinic radiation that's being

17  absorbed, number one.  So those are two different looks.  UV

18  absorbance, and, I believe, again, what Mr. Ossola said is

19  that's a logarithmic function.  And, number two, the claims

20  look at how much of the actual light that's used to back

21  expose is being captured by the support layer.  How much gets

22  through and how much gets captured.

23          Number two, the claims look at percentage values like

24  80 to 99 percent.  This looks at values which are 1.9 to 2.3.

25  So there's no translation between 1.9 to 2.3 and what the

—Motion - 4/16/13—

1    percentages are in the claim; i.e., 80 to 99 percent.  And

2    then finally, again, what's here is focused on the single

3    wavelength 350 nanometers.  What's at issue in the patent is

4    actinic radiation, which was construed to mean that which

5    creates a change in the photopolymer, and then 18 clearly

6    calls out 300 to 400 nanometers.  So on three fronts we have

7    something fundamentally different between what's in this

8    document from 1991 and what's in the claim limitations of the

9    patent at issue.

10          So we ask DuPont the question:

11         "Do you know what the UV absorption percentage was of

12   the Cronar® 773x on the DPS 45 plate that was sold to Banta as

13   reflected in those invoices?"  And we're talking about the

14   Banta invoices.

15         "No, I don't."

16         So DuPont itself --

17         THE COURT:  That's Taylor, though.  Then they hire an

18   expert, Henderson, who says, I have a sample plate.  It was

19   good.  It is contemporaneous to those days.  I have measured

20   it.  It meets the manufacturing specs.  Now I have tested it

21   for absorption, and, lo and behold, it is 94.6.

22         MR. HORVACK:  Now I understand your question.  I

23   agree, and I will get to Henderson.  I was just focusing on

24   the document itself in DuPont's own testimony with respect to

25   that document.  So DuPont -- so facially there's three very

—Motion - 4/16/13—

1   distinct differences, one.  And then, two, DuPont can't make

2   the correlation or translation itself by looking at its own

3   spec and what's claimed in the patent.  And I agree that they

4   tried to fill the gap with Henderson, and I will speak to that

5   in a moment.

6           THE COURT:  So the three things on this spec sheet,

7   going back to your Slides 30 and 31, is the description of the

8   film at the top.

9           MR. HORVACK:  Yes.

10          THE COURT:  And then the UV absorption at 350.  And

11  what's the third thing that gives you?

12          MR. HORVACK:  UV absorbance versus percentage of

13  actinic radiation that's absorbed.

14          THE COURT:  Oh, I see.  I see the other half of that

15  same line.

16          MR. HORVACK:  Yes, exactly.  And then the final thing

17  is the 1.3 to 2.3 values in the spec sheet versus the 80 to

18  99 percent, which is called out in the claims.

19          So I guess in total with respect to J there's four

20  reasons why this document from six or seven years earlier does

21  not corroborate their story.  One is the blue in the UV

22  absorber in the top.  Two is it calls out UV absorbance, which

23  is not percentage of actinic radiation.  Three is that it

24  focuses solely on one wavelength, 350.  The claims do not.

25  And, in particular, 18 gives a range of 300 to 400.  And then,

—— Motion - 4/16/13 ——

 1    finally, the values in the spec sheet 1.93 to 2.34 do not

 2    correlate to 80 to 99 percent absorption.

 3              THE COURT:  Not on their face.

 4              MR. HORVACK:  Not on their face.  Absolutely.  I

 5    agree.

 6              THE COURT:  Okay.  Go ahead.

 7              MR. HORVACK:  So, again, we asked the question of

 8    DuPont, and they cannot translate it for us during the

 9    30(b)(6) binding testimony, I may add.

10              So going to the next document, and I promise we'll

11    get to Dr. Henderson.  It is just not in that order here.

12              THE COURT:  That's fine.

13              MR. HORVACK:  So with respect to Exhibit K, this is

14    the research report itself, indicates that this film -- at

15    least in January of 1991 -- showed significant variability in

16    UV absorbance.  And they say, Well, ignore that, don't focus

17    on that too much.  That might hurt me if you did, but I submit

18    to you it's their burden to prove written corroboration that

19    the elements of the claim is absolutely met, which requires

20    uniformly distributed throughout the layer.

21              THE COURT:  They say this was just, you know, one

22    effort, and then gradually they got it down to uniformity.

23              MR. HORVACK:  That's their testimony.  The document

24    indicates that sometimes they got it and sometimes they

25    didn't.  So as it relates to the plates at issue, which are

—Motion - 4/16/13—

1   six or seven years later, they didn't corroborate that they

2   got it because there's evidence that they didn't get it at

3   various points in time.  And, so, there's uncertainty, and

4   when there's room for doubt, the law says that their motion

5   should be denied, and at trial I will submit that their

6   defense should be directed against them, but that's a

7   different issue.  But, certainly, in this motion they can't

8   satisfy their heavy burden with an internally contradictory

9   document.

10          I, the manufacturing, open quotes, "recommendation,"

11  end quotes.  There's a number of reasons why this does not

12  corroborate anything.  The first is that they tell you that

13  the products EXP DD or EX, whatever they may be, were made in

14  Germany.  This recommendation is coming out of New Jersey.

15  There's nothing in this document which says this is a

16  manufacturing recommendation for Germany.  It is coming

17  facially out of Parlin, New Jersey.

18          THE COURT:  Can I just stop you there for a second?

19          MR. HORVACK:  Sure.

20          THE COURT:  I know that.  And I'll ask DuPont about

21  that in a minute.

22          MR. HORVACK:  You saw that, too.  You noticed that,

23  too?

24          THE COURT:  What?

25          MR. HORVACK:  That the document was coming out of New

—————— Motion - 4/16/13 ——————

1   Jersey.

2           THE COURT:  Sure.  You know, and they even say it in

3   their brief, but I did have a question for you on that.

4           Give me a second, please.  I know what I am looking

5   for, and I shall find it.

6           MR. HORVACK:  This is I to, I believe, Dr. Taylor's

7   declaration.

8           THE COURT:  Taylor's declaration if you go to J,

9   Exhibit J for a second.

10          MR. HORVACK:  Yes.  That's the document we just spoke

11  about.

12          THE COURT:  Right.  But back into it for a second.

13  If you turn to the bottom of the page number that ends in 746.

14          MR. HORVACK:  Yes.

15          THE COURT:  Okay.  And I'm reading out of context

16  here, obviously, because we're in the middle of this document,

17  but, of course, J is the raw materials spec --

18          MR. HORVACK:  Yes.

19          THE COURT:  -- for the Blue Base.

20          MR. HORVACK:  I believe it is a blue adhesive.

21          THE COURT:  Whatever it is.  "Supplier, DuPont

22  Imaging Department, Brevard, North Carolina.  Plants and use:

23  Parlin, Neu-Isenburg."  So they're linking up your New Jersey

24  facility and your German facility to do the Cyrel support

25  layer for you.  That wasn't pointed out by DuPont, but we

—— Motion - 4/16/13 ——

1    spotted it as we went along.

2           MR. HORVACK:  Judge, I think that's a fair point.  I

3    have no doubt that this blue adhesive absorbing coated film

4    was used both in Parlin and in Germany for the analog plates

5    for antihalation purposes.

6           THE COURT:  You say "analog plates."

7           MR. HORVACK:  Because it says, "antihalation."

8           THE COURT:  But you just told me when you were giving

9    me a little tutorial a minute ago that antihalation can be an

10   issue for digital plates, too.

11          MR. HORVACK:  I don't retract that, but in 1991 there

12   were no digital plates.

13          THE COURT:  That's true.  Okay.

14          MR. HORVACK:  Okay.  We know that this is designed

15   for analog plates.  I don't think anyone -- I don't even

16   believe they would suggest otherwise.  They're simply saying

17   we had it for analog plates in the warehouse, and trust us, we

18   put it on this DPS 45 set of plates, which were sold three

19   times in the U.S.

20          THE COURT:  And worked fine.

21          MR. HORVACK:  It worked great.  Believe me.  It is

22   true.  So, as it relates to this, okay, the supports were used

23   in both Germany and New Jersey.

24          With respect to I --

25          THE COURT:  According to the same specs.  They say

—— Motion - 4/16/13 ——

1    you have got to follow these specs in our plants, and here are

2    our plants that are making this in 1991.

3            MR. HORVACK:  Yes.  I agree.

4            THE COURT:  Okay.

5            MR. HORVACK:  So with respect to I, coming back,

6    facially it is New Jersey, although they say these plates are

7    made in Germany.  Second, it is a recommendation, and there's

8    no proof --

9            THE COURT:  The plates are made there.  I don't know

10   whether the support layer is made there.  My sense of this is

11   that the support layer comes from probably that plant in North

12   Carolina, gets shipped to Parlin and to Germany to DuPont's

13   facilities, and then it gets assembled there into a three- or

14   four-layer plate.

15           MR. HORVACK:  I think you're right.  I think you're

16   right.  So the question, though, is was that support from

17   North Carolina, had the material uniformly distributed

18   throughout put on to these DPS plates, which were sold three

19   times.  And this particular document does not indicate that

20   this recommendation was followed for these particular

21   products.

22           Further, it can't possibly be, given the dates on the

23   document, that it was followed for the 1997 sales because the

24   date approved is February 8th, 1998.  And, so, the initial two

25   sales in late 1997 couldn't possibly be following this

1    recommendation; the recommendation didn't even exist.  It was

2    typed, completed the last day of 1997 and only approved

3    February of 1998.  So then as it relates to the final sale

4    that they rely upon, the third in May of 1998, well, okay, I

5    guess maybe it is possible that this could have been --

6           THE COURT:  Okay.  That will do, won't it?

7           MR. HORVACK:  No possibilities here.  Because the

8    other possibility is equally true, and that is that the

9    products that were sold in May were in inventory and

10   manufactured before February of 1998.  So with their burden

11   they have satisfied nothing as relates to this particular

12   exhibit.  Does it apply to Germany?  We don't know.  Was it

13   followed for the plates made in Germany?  We don't know.  It

14   is a recommendation.  Further, it couldn't possibly be for the

15   first two because it didn't exist after all.  And, third,

16   there's room for doubt as relates to the third.

17          So here's the point where you were at previously,

18   which relates to Dr. Henderson.  So all of those documents

19   currently as it comes to play out DuPont agrees that the

20   documents do not meet Claims 16 through 18, 24 to 27, and, so,

21   in comes their expert Dr. Henderson.  Dr. Henderson is a hired

22   expert.  He is a very nice man.  But he was provided a plate

23   by Dr. Taylor, and Dr. Taylor told Dr. Henderson this is a 45

24   DPS plate.  It was manufactured, open quotes, "around

25   September of 1998," end quotes, and it is from this particular

—————— Motion - 4/16/13 ——————

1    batch.  Dr. Henderson, of course, has no reason to doubt Dr.

2    Taylor, but the law does.

3         So Dr. Henderson does testing on this plate, and he

4    comes to some conclusions.  I say that where are the documents

5    that prove essential chain of custody legal type foundational

6    evidentiary matters for this particular case?  For example,

7    where's the proof that this particular plate came from that

8    batch?  Where is a photo of the box?  Where --

9              THE COURT:  You asked?

10             MR. HORVACK:  I did.  We don't know.  We have

11   nothing.  Certainly, there's nothing in the record.

12             THE COURT:  Taylor said he kept a box.

13             MR. HORVACK:  I agree.  I totally agree.  I would

14   like to know where the box is and whether it is missing a

15   plate or not.

16        Secondly, how do we know, and where is the document

17   that says that Dr. Henderson's tested plate was manufactured

18   before October 11th, 1998?  Suspicious at best; deceptive at

19   worst when they say "around September of 1998."

20             THE COURT:  And I'm sure that you zeroed in on that

21   with Taylor, but I haven't seen it in the excerpts that you

22   have given me, either side.

23             MR. HORVACK:  This declaration was filed in the

24   summary judgment, and I deposed Dr. Taylor before that.  I

25   promise you that if I had this declaration before me I would

1   have asked him.  I didn't have it.  It didn't exist.  It

2   wasn't in the record, and so I didn't.  I, certainly, asked

3   him many questions about -- and Dr. Henderson in particular --

4   about the 45 DPS plate that he tested.  Dr. Henderson says it

5   was given to him by Dr. Taylor, and he told him X, Y, and Z.

6          THE COURT:  All right.  I understand.

7          MR. HORVACK:  So when they declare it is around

8   September of 1998 that could be before or it could be after

9   the critical date, October 11th, 1998.  It is suspicious that

10  they use "around."  I would suggest to the Court given their

11  burden here doubts do not bode in their favor.  It requires

12  denial.

13         The final, and most important point in my view, is

14  that where is the documentary connection that this plate,

15  wherever it was made, whenever it was made is, in fact, just

16  like, made with, and in the same way as those plates that were

17  sold to Banta and Cage Graphics?  Where is the connection?

18  Where is the formulation records, manufacturing records

19  with -- about this plate that was tested and has values,

20  apparently, according to the patent claims, where is the

21  connection that that is just like the precritical date sales?

22  I submit there's none.  With none it is denied.  With none, as

23  we get to trial, the issue would be taken from the jury, and I

24  will ask you to do that.  At this point it should simply be

25  denied.

———— Motion - 4/16/13 ————

1          THE COURT:  Let me just tell you, if this issue

2     survives this motion, I have an invariable practice that I do

3     not take from the jury until after the jury has come out with

4     its verdict, and then I go back and I deal with the Rule 50

5     motions.

6          MR. HORVACK:  That's the proper practice.  It would

7     be the practice of the lawyer to stand up, nonetheless, with

8     recognition of what you're going to do and ask, nonetheless,

9     knowing it is a sure fire loser.

10          THE COURT:  No, it is just reserved.

11          MR. OSSOLA:  Your Honor, I apologize to Mr. Horvack,

12     but do you mind if we took just a short break?

13          THE COURT:  Yes.  Sure.  And I think it is a Rule 50

14     motion on civil practice.

15          MR. HORVACK:  Yes.

16          THE COURT:  Okay.  Fine.

17          MR. OSSOLA:  I appreciate the Court's indulgence.

18          THE COURT:  No problem.

19          (Break taken from 4:38 to 4:48 p.m.)

20          MR. HORVACK:  So as I indicated, the first issue,

21     written corroboration, I have 10 separate reasons for denial.

22     I have gotten through all 10 of them.

23          The second point is W.L. Gore, and it relates to the

24     method claims, and the point here is that even if the record

25     fully corroborated their version with respect to 45 DPS, that

─────Motion - 4/16/13─────

1   it satisfied all the requirements of the product aspects of

2   the claims, the method claims 13 to 18 would still not be

3   invalid, and that's because Dr. Taylor, according to his own

4   declaration, completed the customer jobs inside DuPont's

5   facility.  In other words, he took the raw plates, he back, he

6   front, he laser ablated, et cetera, and he sent the finished

7   plate to be used by the customer however they wished.  But

8   when you look at this plate, this finished plate, you can't

9   tell how it was made.

10          THE COURT:  How about the fact that Taylor had

11   customers walking through his facility and they were

12   demonstrating the making of a plate?

13          MR. HORVACK:  Right.  How it was made, what's in it,

14   and, in particular, what the support layer is made of and

15   consists of, particularly given that there's claim limitations

16   with respect to optical properties of this support.  So if

17   those passers-by could somehow figure out that there was a

18   Blue Base and it had Tinuvin® and all of the things that they

19   say, I don't think so.

20          So W.L. Gore says a non-patentee's non-public use of

21   the process is not a bar, even though the product itself was

22   sold or publicly used before the critical date.  So, in other

23   words, everything needs to be in the public domain in order to

24   satisfy the method claims.  If one thing is not, or a group of

25   things are not, it is not.  And the critical point of Gore is

—Motion - 4/16/13—

1   when you look at the ultimate product can you figure out how

2   it's made and what's in it, and the process associated with

3   that, and I submit to you looking at these plates, that is an

4   impossibility.

5           THE COURT:  Well, you and DuPont have a difference of

6   opinion as to how this law works.

7           MR. HORVACK:  I gathered that.  And, so, I know that

8   you're very adept at reading these cases, and you're going to

9   figure out who's right.  But I agree with you.  We have a very

10  distinct interpretation and difference as relates to W.L.

11  Gore.

12          The third issue is, okay, if they, indeed, had a

13  written corroboration for what was in DPS 45, in particular

14  what the support was, the question still remains under the

15  Rule of Reason whether that's sufficient to meet this very

16  high clear and convincing standard.  And the Federal Circuit

17  has created factors as they like to do, and I submit to you

18  that if you apply these factors you are going to come to the

19  conclusion that it is not sufficient, number one.

20          Number two, at a very bare minimum there's a jury

21  question as relates to this because Dr. Taylor is essential to

22  their defense.  It turns -- their defense -- in large part on

23  the veracity of Dr. Taylor.  For example, going back to Dr.

24  Henderson, well, was what was given to Dr. Henderson a DPS 45

25  plate which was identical to the invalidating sales or not?

———— Motion - 4/16/13 ————

1   Dr. Taylor says it was without any documentation.  And, so,

2   under the Rule of Reason you ask these various questions:

3          First, is he an interested and biased witness?  Well,

4   my goodness, he is.  He has been employed by DuPont for years,

5   decades.  And, by the way, in the past he has received

6   financial rewards from DuPont for his participation in

7   litigation matters.  He is distinctly interested and biased.

8          Two, as relates to certain things he is wholly alone

9   on an island.  So for example, this issue, which is important

10  to Your Honor about the plate and Dr. Henderson's testing of

11  it, who else but Dr. Taylor says I had this plate in my lab

12  for years.  It is a 45 DPS.  It has Cronar® 773x on it, and it

13  is identical to the gauge in Banta sales.  Nobody does that

14  but Dr. Taylor.  There's no other declaration.  And there's no

15  documents.

16         So the Supreme Court rightly says the truth is rarely

17  found in the unsupported testimony of one individual,

18  particularly when they have a financial interest in the

19  outcome.  This factor bodes in favor of denial.

20         Third, did he find himself or was he in a position to

21  actually know what he says to be the case as relates to 45

22  DPS?  He clearly did not.  So if you look at the manufacturing

23  recommendation, which I believe is I, Exhibit I, he is not on

24  that document.  You see Dr. Fan, you see Dr. Chiu.  You see

25  others.  There's no Dr. Taylor on the face of that document.

—— Motion - 4/16/13 ——

1    He did not conceive, design, formulate, or manufacture this

2    product, period.  What he did do was process these plates.

3    That does not tell you what the plates are made of or how

4    they're made.  He was not in a position to know, and those who

5    were, remarkably, did not file a declaration in this court of

6    law.  Factor in favor of MacDermid.

7            Further, because he doesn't know, he engages in rank

8    speculation.  He looks at back exposure times and infers what

9    the support is or is not.  And with respect to this particular

10   document G, indeed, there are some which have longer

11   exposure -- back exposure times than others.  He infers from

12   that, without any personal knowledge, that, therefore, they

13   must have a UV-absorbing substrate or support layer.

14       Well, I submit to you that there's others in the same

15   document which would -- if you want to engage in

16   speculation -- would suggest the exact opposite.  There's

17   20 seconds for this particular plate of 45 DPS-2.  And, so, if

18   you want to engage in speculation, we can speculate that some

19   did, some didn't.  Which of those made it to the sales?

20           THE COURT:  Is 20 seconds too short to have

21   absorption?

22           MR. HORVACK:  It is.  Yes.  If you look at the patent

23   at issue, you're going to see that 30 seconds or less is too

24   little and suggests that there's no UV-absorbing material in

25   the substrate.  And he does the exact -- he agrees with that

—— Motion - 4/16/13 ——

1   logic because he did the exact opposite inference with longer

2   back exposure times.

3           Again, I noticed he was unsupported by his colleagues

4   such as Dr. Fan and others.

5           So, in conclusion, he is the sole declarant with

6   respect to very precise matters, which occurred nearly 15

7   years ago, and, by the way, he has a financial interest, and

8   he wasn't personally involved.  Factors under the Rule of

9   Reason in favor of MacDermid.

10          Further, Dr. Taylor was, as Mr. Ossola was suggesting,

11  involved in expanding the use of digital back before the

12  critical date.  He produced, published some papers, which are

13  G and H.  Not one of them talk about a specialized support

14  being used on their plates or using back exposure steps with

15  that specialized support.  Again, if it were true and a

16  particular feature of importance to them you would think that

17  his publications would have it in there.  There's no

18  reference.

19          THE COURT:  Why didn't at deposition you ask him --

20  I'm not asking for your strategy; I just couldn't understand

21  why this was in the papers about his, you know, digital is the

22  future article and a presentation that he made similar to that

23  article, and then he says, well, Dr. Fan also made a

24  presentation to that FTC or somebody.

25          MR. HORVACK:  FTC.

———————— Motion - 4/16/13 ————————

1          THE COURT:  I didn't follow that at all.

2          MR. HORVACK:  I think that might have been in the

3    other case, Judge, to be honest with you.

4          THE COURT:  No, no.  It is in these motion papers.

5          MR. HORVACK:  It could very well be that we were

6    establishing that both of their publications do not establish

7    the story now, which is that they used the specialized support

8    layer of the '835 patent before the critical date.  My

9    recollection of this is fuzzy.

10          THE COURT:  That's fine.  Move on.

11          MR. HORVACK:  Okay.  Bottom line is his writings

12    didn't include what he says now, and you would expect that

13    they would.

14          Further, they have, as you know, a wide, vast patent

15    portfolio.  They like to use it often.  And with respect to

16    digital they have a number, and none of those digital

17    plates -- withdrawn.

18          None of those digital patents make any mention

19    whatsoever of utilizing the specialized support to absorb UV

20    radiation for back exposure purposes, and that is suspicious

21    at best.  So the chart here talks about, you know, whether

22    imaging and oxygen, this $O^2$, is talked about or not whether

23    good or bad.  And you'll see that there's opposite teachings

24    in their patents versus ours.  They say imaging and oxygen is

25    not good.  They actually suggest away from it.  We say it is

—— Motion - 4/16/13 ——

1  present and good, but you need to manage it.  So while they

2  say they invented this, they're actually teaching the opposite

3  in their patent portfolio.

4       With respect to the back exposure times we say short

5  ones are bad, they're not good.  They say they're acceptable,

6  and they actually use back exposure times of small seconds,

7  three to five seconds.

8       Finally, with respect to the UV-absorbing material

9  and the substrate we say obviously good, we claim it.  They

10  don't address it at all.  Period.

11       THE COURT:  Are these prior patents or subsequent

12  patents?

13       MR. HORVACK:  They're both.  It spans.

14       THE COURT:  I saw them all.

15       MR. HORVACK:  It spans a very good period of time

16  before and after.  I don't know.  It is their invention.  They

17  don't teach it.  They didn't claim it.  They know how to do

18  those things.  Under the Rule of Reason Woodland Trust factors

19  that bodes in our favor.

20       THE COURT:  Which factor?

21       MR. HORVACK:  The factor about the credibility or

22  veracity of their testimony in contradiction or impeachment of

23  the witness' testimony in particular, so four.  So they say it

24  is ours, but they actually have teachings to the contrary, and

25  they never talk about it.

────── Motion - 4/16/13 ──────

1          So 19.  Their literature, which they actually submit

2     to you in Exhibit F goes through the process steps with

3     particularity.  Says laser image it, make the mask integral,

4     and then plates are then main exposed through the integral

5     mask then washed out in conventional solvent processing.

6          THE COURT:  Where's the back exposure?

7          MR. HORVACK:  That's my point.

8          THE COURT:  Yes, but their little operator's manual

9     thing with the machine contemporaneous, I think dated

10    January 1998 --

11         MR. HORVACK:  Okay.

12         THE COURT:  -- says on page -- you know, this chart

13    that everybody has seen says, zap it on the back and lay your

14    mask; zap it on the front then clean it out.

15         MR. HORVACK:  Right.  Agreed.  And you noted that

16    DuPont at that point in time was selling other plates, not

17    just DPS, so DPU.  I will just submit to you that as it

18    relates -- so that's a general manual.  As relates to this

19    particular plate; i.e., the one that they're saying

20    invalidates my client's patent claims, their product

21    literature for that product does not have back exposure

22    teachings and includes then, which would suggest that there's

23    no required interim steps.

24         THE COURT:  I'm sorry, what product literature for

25    what product, the DPS product?

1          MR. HORVACK:  Yes.

2          THE COURT:  The DPS plate?

3          MR. HORVACK:  Yes.

4          THE COURT:  Okay.  That's not your Slide 50.  It is

5    some other slide.  Oh, I see.  The product literature for the

6    DPS.  Go to F.  Different exhibit, yes.

7          MR. HORVACK:  So you see it is from 1997 they get

8    some award for technical innovation, and then they teach their

9    customers how to use it.  So under the process of use on the

10   next page the process of use that they're telling their

11   customers to use does not include a mandatory required step of

12   back exposure.  It actually doesn't even include it.  And then

13   if you go to their product literature now, our Exhibit I, lo

14   and behold, for their infringing products they teach a back

15   exposure test.  They teach and direct their customers to use a

16   back exposure step.

17         THE COURT:  Expose the plates from the back.

18         MR. HORVACK:  That's right.  This, obviously,

19   suggests they did not invent what's claimed in the '835

20   patent.  They simply have copied it.

21         THE COURT:  Well --

22         MR. HORVACK:  A reasonable juror would infer that

23   they didn't invent what's been claimed, they copied it.  A

24   fair and reasonable juror could reach that conclusion.

25         THE COURT:  But that's not before me today.

─────────────── Motion - 4/16/13 ───────────────

1    MR. HORVACK:  In part it is.  You need to decide if

2  there's a jury question, and if a fair and reasonable juror

3  could find that they didn't invent it, they copied it, and the

4  story about DPS 45 is not credible, that's a jury question and

5  it needs to go there, and if it is before you, you need to

6  deny the motion for summary judgment and let them decide who

7  is right and --

8    THE COURT:  What is before me is whether they had

9  your invention on sale and in use before the critical date.

10    MR. HORVACK:  I agree.  I agree.  And this is just

11  that they did not because their product literature before does

12  not teach back exposure, and after it does.

13    Final issue is Claim 27, and, so, firstly, they

14  didn't corroborate what 45 DPS is, and, therefore, just like

15  all the other claims, Claim 27 survives, as well.

16    Secondly, they concede it is not literally anticipated

17  by 45 DPS, and literal anticipation is what's required under

18  102(b).  We all know strict identity is required.  The test is

19  just like literal infringement just with a different temporal

20  look and view and that the 102(b)/103 bar that they cite to

21  relies upon, as it relates to patentability, is not used in

22  courts of law, period.  It is a hybrid doctrine, which is

23  sometimes used in the patent office, and in In Re: Smith it

24  proves out that that was okay for the patent office to do

25  that.  Courts of law need to follow Graham and KSR and the

1   tests set out in 103 if there's no literal anticipation.

2          With respect to Graham, here, if one did apply them,

3   which they did not because they relied upon this hybrid

4   doctrine, you would have to find that they didn't establish

5   the scope and content of the prior art because they didn't

6   corroborate properly 45 DPS in the prior art.

7          Number two, there's no definition in Dr. Henderson's

8   report about what the level of ordinary skill in the pertinent

9   art is or should be or what his view on that is, and you

10  absolutely, of course, need that because you're adjudging

11  obviousness through that lens.  Is it a highly technical very

12  smart person or not so?  It depends.  It is critical to the

13  inquiry.  They have not established that, nor did they

14  establish any reason under KSR to make the combination or

15  adjustments that they seek.  And then they wholly ignored

16  secondary factors.

17         The issue about Dr. Shock I find intriguing.  Dr.

18  Henderson says, Well, Dr. Shock around the same time period as

19  Dr. Kanga came to the same view.  Well, the evidence of -- on

20  those points are as follows.  Dr. Kanga began a program with

21  respect to Melinex, and he established and created a plate

22  Melinex 6248-700.  Dr. Shock admits that he afterwards began a

23  project with Melinex, and he used Dr. Kanga's support, Melinex

24  6248-700, as his starting point.  How convenient for him.  He

25  used Dr. Kanga's work.

———— Motion - 4/16/13 ————

1          THE COURT:  965 is Kanga's or is there a question

2     about that?

3          MR. HORVACK:  So the conventions were that Melinex

4     6248-700 was sort of the experimental number.  And then it

5     turned into their Melinex, which I believe is 965.  So the

6     chronology is Kanga is working with Melinex to develop a

7     UV-absorbing specialized substrate.  Dr. Kanga -- excuse me,

8     Dr. Shock follows in his wake and begins his project with Dr.

9     Kanga's support film 6248-700.  And there's admissions in the

10    record that Dr. Shock suspected that that was, in fact, the

11    case.

12         Further, there's a document, an e-mail from May of

13    2000, which indicates that Dr. Shock would like some of my

14    client's plates to do some analysis and that he recognized

15    that PTI, which is Polyfibron, the predecessor to MacDermid,

16    was already working with Melinex to make an improved UV base,

17    and, so, he wanted some of our plates.  He further testified

18    that he analyzed our plates, and he did that because in his

19    view at this point in time, 2000 or so, MacDermid had gained a

20    technical advantage or edge over DuPont, and he was designated

21    to overcome that.  So I submit to you that Dr. Shock proves

22    nothing other than he copied, replicated my client's

23    invention.  It certainly doesn't corroborate anything other

24    than that.

25         THE COURT:  Melinex 965 is DuPont's support layer,

—— Motion - 4/16/13 ——

1   yes?  Are you there?

2        MR. HORVACK:  I'm here.  I think the answer is yes.

3   I just don't want to answer incorrectly.

4        THE COURT:  On Slide 56 --

5        MR. HORVACK:  Yes.

6        THE COURT:  -- I would like to correct a typo that

7   you've got there that I see too often to pass it by, which is

8   you say in your second bullet point, "ultimately this program

9   lead (sic) to the development..." see that?  Second bullet

10  point on Page 56.

11       MR. HORVACK:  I see that.

12       THE COURT:  This is the kind of thing that I daydream

13  about.  It is not spelled L-E-A-D.  L-E-A-D is the present

14  tense of lead.  The past tend of lead is L-E-D.

15       MR. HORVACK:  You're right.

16       THE COURT:  You're talking about a heavy metal maybe

17  you would spell it L-E-A-D.  Thank you.  That's the only thing

18  I absolutely needed to mention.  But since I was looking at

19  that, and you were going on about Melinex 965, it is just a

20  support layer?

21       MR. HORVACK:  It is.

22       THE COURT:  And is it --

23       MR. HORVACK:  It has UV-absorbing properties.

24       THE COURT:  Is it a DuPont item?

25       MR. HORVACK:  Yes.

────── Motion - 4/16/13 ──────

 1          THE COURT:  Is it a patented DuPont item?

 2          MR. HORVACK:  Since it infringes our patent, yes, but

 3   not by them.

 4          THE COURT:  Excuse me.

 5          MR. HORVACK:  It is covered --

 6          THE COURT:  A patent by you, according to you.  So is

 7   this one of the accused devices in this lawsuit?

 8          MR. HORVACK:  I believe the answer is yes, but you're

 9   testing my recollection, and I apologize, I'm not positive

10   about the number.  I'm positive their Melinex films, which are

11   used on their plates, are infringing.  I'm uncertain whether

12   they still use 965.  They did.  I don't know if they still do.

13          THE COURT:  Okay.  Fine.

14          MR. HORVACK:  So the bottom line of the story here is

15   that their scientists followed our scientists, and that proves

16   nothing other than copying and certainly doesn't prove that

17   the claims are obvious.

18          So, in summary -- I think this is important -- as it

19   relates to all the claims corroboration, written

20   corroboration, which is contemporaneous, the first 10 points I

21   have made are lacking.  Secondarily, credibility is lacking.

22   So under the Rule of Reason, the Woodland Trust factors,

23   that's lacking.  And DuPont forced me to reread Sandt

24   Technology, including the concurring opinion by Judge Dyk.  I

25   would urge you to do the same.  He is very clear that with

--- Motion - 4/16/13 ---

1   respect to this particular type of defense it is rare, if

2   ever, that summary judgment should be granted because it is

3   turning, in large part, on the credibility of who, in fact,

4   invented the claimed invention, and that is, according to him,

5   a jury question at its heart and core.

6           Two, _Gore_ demands denial with respect to the method

7   claims, as we discussed.  And 17 lives no matter what.

8           Thank you.

9           THE COURT:  Thank you.

10          MR. ALLEN:  If I may, Your Honor, may I make a few

11  very quick rebuttal points?

12          THE COURT:  Of course.

13          MR. ALLEN:  I'm just going to try to go through this

14  really quickly and highlight a few of the key issues that we

15  would like to discuss.

16          THE COURT:  Okay.

17          MR. ALLEN:  So, first of all, on the corroboration

18  points, Mr. Horvack had bullet points number 2 and number 3

19  where he focused on the lack of or the alleged lack of

20  particular types of evidence that he, apparently, thinks is

21  necessary to prove a 102(b) case, and, in particular, the

22  manufacturing records, for example, Cronar® 773x are the

23  manufacturing records for 45 DPS.  And I submit to you that

24  his requirement that a specific type of document is needed to

25  prove a 102(b) case is patently wrong.  _Sonoscan_, for example,

1  indicated that any relevant evidence may be used to prove a

2  102(b) case, such as memoranda, drawings, correspondence, and

3  testimony of witnesses.  And that's exactly what we had

4  presented in our opening brief, and I have made a record

5  today, is we have relied on two types of oral testimony; Dr.

6  Taylor's declaration, as well as the 30(b)(6) testimony of

7  both Dr. Shock and Dr. Taylor.  And then couple that with a

8  multitude of documentary evidence that corroborates the oral

9  testimonies of Dr. Shock and Dr. Taylor.  And, again, we also

10  have the oral testimony of Dr. Henderson for a few specific

11  points and testing on those points, as well.

12        So that corroboration was given to you in our reply

13  brief in that Appendix 1 that you received later last week

14  because we mistakenly forgot to give it to you.

15        THE COURT:  That's fine.

16        MR. ALLEN:  So Appendix 1, again, as stated in our

17  letter brief, it just walks through each claim limitation and

18  then shows exactly on the record that we created in our

19  opening brief where you can find oral testimony and where you

20  can find documentary evidence supporting that oral testimony.

21        And if you may, Your Honor, we created for your

22  convenience a binder that has Appendix 1, and for each claim

23  limitation we pulled the documents for you for your

24  convenience.  If you would like a copy of that, we could give

25  it to you.  We have provided one to opposing counsel, as well.

—————— Motion - 4/16/13 ——————

1          THE COURT:  I have all these.  I have all these

2   already in your motion papers.

3          MR. ALLEN:  Okay.

4          THE COURT:  Thank you.

5          MR. ALLEN:  And then on bullet point number 4 of his

6   corroboration argument Mr. Horvack points to the 30(b)(6)

7   testimony and says, look, DuPont's deponent didn't know what

8   the formulation of Cronar® 773x was.  As we made clear in our

9   reply brief, and MacDermid hasn't acknowledged today, is that

10  that 30(b)(6) testimony was of Dr. Taylor.  Dr. Taylor was not

11  the person that was designated for that topic.  Dr. Shock was,

12  and you if you read Dr. Shock's testimony, which is in

13  Appendix 1 in our brief, Dr. Shock clearly and unambiguously

14  described what the formulation of the Cronar® 773x support

15  layer was.

16       Dr. Taylor's knowledge is about the general structure

17  of the support layer.  We never asked him, and he has never

18  even attempted to testify what the formulation is.  He just

19  knows based on his experience at DuPont in working with these

20  45 DPS plates what the general structure is.  The detailed

21  chemical information he may not know, but he knows that it has

22  a LAMS layer, it has a PLS layer, and it has a Cronar® 773x

23  support layer.

24          THE COURT:  You're referring to Dr. Shock's

25  deposition testimony?

─────────────── Motion - 4/16/13 ───────────────

**1**      MR. ALLEN:  No, I'm referring to Dr. Shock's 30(b)(6)

**2**  testimony, which was Exhibit A to the Allen declaration in our

**3**  opening brief.  Dr. Shock's testimony goes up through about

**4**  early Page 100; I think we highlighted this in our reply brief

**5**  where the cutoff was, but it is escaping me right now.

**6**      THE COURT:  Bear with me, counsel.  I think I have

**7**  all the motion papers in front of me.  Needless to say, I

**8**  don't have the appendix that you have assembled and offered to

**9**  me today, other than the chart of the appendix.  I don't have

**10**  the materials that you're referring to in the appendix.  You

**11**  just said to me that Dr. Shock, who was involved in

**12**  formulating the DPS 45 unambiguously described what the

**13**  formulation of the support layer was --

**14**      MR. ALLEN:  Yes.  That's correct.

**15**      THE COURT:  -- in his 30(b)(6) testimony, right?

**16**      MR. ALLEN:  That's correct.

**17**      THE COURT:  And I'm looking at this, your chart, your

**18**  appendix to your reply brief, and I'm wondering where Shock is

**19**  referred to there.  Allen declaration Exhibit D.  Allen

**20**  declaration Exhibit D attached.  Hang on just a minute.

**21**      I'm looking at Allen declaration Exhibit D, which is

**22**  a 30(b)(6) deposition on December 8, 2011.

**23**      MR. ALLEN:  That's correct, Your Honor.

**24**      THE COURT:  Is that Dr. Shock?

**25**      MR. ALLEN:  Part of it is.

—————— Motion - 4/16/13 ——————

1        THE COURT:  Go ahead.

2        MR. ALLEN:  Part of that testimony is.  This is a

3   combined record of both Dr. Shock's 30(b)(6) testimony and Dr.

4   Taylor's.  They are all combined into one transcript that just

5   had continuous page numbering.

6        THE COURT:  Well, I know Dr. Taylor was 30(b)(6)

7   deposed on December 7, 2011, because the excerpts of his dep

8   that are in MacDermid's declaration submitted by Mr. Robinson

9   Exhibit N the questioner says, "Now, Dr. Taylor, let me ask

10   you this..." so I know it is Taylor there.

11        We'll take a moment.

12        MR. OSSOLA:  Excuse me, Your Honor.

13        THE COURT:  That's fine.

14        That's Taylor.  On at least the excerpt that I have

15   in the Robinson Exhibit Declaration N from a 30(b)(6)

16   deposition on December 7, 2011.  Your declaration, Mr. Allen,

17   docket number entry 166-2 that contains four exhibits, has

18   excerpts of depositions at Exhibit D, and it is a 30(b)(6)

19   deposition on December 8th, which is the next day, 2011, and

20   on Page 142 of these excerpts, again, the questioner says,

21   "Dr. Taylor, you testified," et cetera, so I surmised that all

22   of this excerpt was from Dr. Taylor, and if I'm wrong I have

23   nothing that you have given me to communicate that anyone

24   other than Taylor is speaking in this Exhibit D excerpt of

25   30(b)(6) deposition from December 8, 2011.

—— Motion - 4/16/13 ——

1          MR. ALLEN:  So if I may, just a few points.  So,

2    first, the Robinson, the December 7th deposition that you're

3    looking at that's actually from the 30(b)(6) deposition of

4    DuPont in the DuPont versus MacDermid case --

5          THE COURT:  Oh, okay.

6          MR. ALLEN:  -- that MacDermid is relying on in this

7    case, as well.

8          THE COURT:  I overlooked the caption.

9          MR. ALLEN:  That's okay.  So that's the first point.

10         So Dr. Taylor is the 30(b)(6) deponent in both of the

11   cases or 30(b)(6) designee, sorry.

12         THE COURT:  Okay.

13         MR. ALLEN:  And then on Exhibit D of my declaration I

14   agree it is a little unclear on who is testifying as to what.

15   I would have to confirm and get back to you, but I am certain

16   that we identified where the cutoff was.  It may have actually

17   been in our response to their statement of facts and their

18   opposition.  I'm certain that's where it is, actually, because

19   they relied on a few of these as undisputed facts, but I have

20   to confirm that.

21         Actually, I can make it easier for you.  Do you have

22   Appendix 1 in front of you that we submitted?  So I have a

23   footnote -- there's a footnote at the bottom of the first page

24   of Appendix 1 that states Dr. Shock's testimony is reflected

25   on Pages 1 to 104 and Dr. Taylor's is 105 to 176.  Sorry for

───── Motion - 4/16/13 ─────

1    the confusion.

2          THE COURT:  So your Exhibit D and your declaration

3    docket entry 166-2 has excerpted pages from Page 25 through

4    Page 142, but anything after Page 104 would be Taylor, not

5    Shock.

6          MR. ALLEN:  That's correct, Your Honor.

7          THE COURT:  Okay.  Just a second, please.  I'll tell

8    you when I'm ready.

9          So here is Shock.  He is asked on Page 80 of his

10   deposition, "So what changes, if any, were made in the PET

11   Cronar® 773x prior to October 11, 1999?"  I don't know whether

12   that's a misstatement.  We all misspeak sometimes.  I'm going

13   to assume that means October 11, 1998, but it doesn't matter.

14         MR. ALLEN:  I think they're referring to '99.  That's

15   the filing date of the patent and the critical --

16         THE COURT:  Okay.  Fine.  And he says, "Well, it was

17   a continuously improved process to improve the performance of

18   that labor.  While we always got good UV uniformity across the

19   web, I suspect that they wanted to improve maybe downstream

20   uniformity."  And then he said, "I saw reports saying that the

21   uniformity had gotten better."

22         Then he is asked, "Did the amount of Tinuvin® 900

23   Cronar® 773x ever change prior to October 11, 1999?"

24         And he said -- and this is quoted, of course, in their

25   motion papers, the other side's -- "I can't be certain.  We

—— Motion - 4/16/13 ——

1  had goals, we had a specification right from the beginning of

2  that product, and I think that remained pretty much throughout

3  for absorbance at 350 nanometers.  I think it was something

4  like 1.93 to 2.34 absorbance at 350 nanometers.  So it was

5  always their task to keep the product in that range, but I'm

6  not sure whether they ever had to vary the amount of Tinuvin®

7  to do that, but I suspect they had a feed rate that they

8  thought was optimal but had to be adjusted at different points

9  in production."

10          "QUESTION:  But as far as you know that specification

11  at 350 nanometers never changed from DuPont's perspective?

12          "ANSWER:  Not that I'm aware of."

13      And that's all he said about the specs, other than it

14  talks about the dye and the Tinuvin® as UV absorbent and what

15  they're for.  Okay?  Go ahead.

16          MR. ALLEN:  Okay.  So just on number four where

17  they're faulting DuPont's 30(b)(6) deponent for not knowing

18  the formula of the Blue Base they're faulting Dr. Taylor, and

19  it's never been DuPont's position, and Dr. Taylor was not the

20  designated person to know that topic, and it has never been

21  DuPont's position even in Dr. Taylor's declaration that he

22  knows the exact formulation of other Cronar® bases.  It has

23  just been Dr. Taylor's position that based on his work with

24  the 45 DPS plate that he knows the general structure of it,

25  including the fact that it had a Cronar® Blue Base, in part,

1  because it was blue colored, and, second, he back exposed it

2  and it took 80 seconds for a back exposure, which indicated

3  that there was something going on with this Blue Base that was

4  different than the support layer used on a 67-gauge plate.

5          So at the end of the day I just submit that you should

6  disregard their point number 4 because that's not Dr. Taylor's

7  testimony.

8          THE COURT:  Okay.

9          MR. ALLEN:  On point number 5, this was -- you're

10 already reading it and getting to my next point on the Shock

11 testimony.

12         THE COURT:  I'm sorry.  I'm trying to follow you, but

13 what are the points?

14         MR. ALLEN:  His reasons for denial.  This would be

15 number 5.  I don't have the slide number on me, but I can grab

16 it.

17         THE COURT:  It will help me.  I know you just get

18 these handouts when you arrive at oral argument.

19         MR. ALLEN:  I think it is Page 29.

20         THE COURT:  Okay.

21         MR. ALLEN:  So reason for denial number 5.

22         THE COURT:  Yes.

23         MR. ALLEN:  On this point MacDermid makes an issue of

24 the manufacturing process changing.  I would just like to

25 point out that Dr. Shock's testimony on this is also clear,

—————— Motion - 4/16/13 ——————

1   that it changed for a specific purpose, that was to replace

2   the powder-fed method of feeding this Tinuvin® 900 into the

3   melt where you start mixing it up and then you extrude it, and

4   that's how you get your support layer.  That was initially

5   powder fed, but they had some issues with that, so they moved

6   to putting the Tinuvin® 900 into a pellet form.  And that's

7   all Dr. Shock's testifying to there that, as you pointed out

8   during Mr. Horvack's argument in that same paragraph

9   describing manufacturing process, change, again, Dr. Shock

10  unambiguously stated that Tinuvin® 900 was always in the

11  formulation.

12          THE COURT:  I just read that.  Okay.

13          MR. ALLEN:  So going on to the procurement sheet,

14  which is their reason for denial number 6 and I think a few

15  more after that.

16          THE COURT:  Yes.

17          MR. ALLEN:  I think the important thing here and the

18  important reason why --

19          THE COURT:  You're talking about the raw material

20  specification for use and procurement?

21          MR. ALLEN:  Yes, Your Honor, that's correct.

22          THE COURT:  Right.

23          MR. ALLEN:  Exhibit K to the DuPont motion.

24          THE COURT:  Right.

25          MR. ALLEN:  So I think the point here and why I think

—Motion – 4/16/13—

1    that your interpretation of how to read that sentence is that

2    it is a blue, adhesive-coated 7 mil Cronar® polyester film

3    with a UV absorber in the film is just referred back to -- I

4    think they may have misquoted; I think you have to refer back

5    to the procurement record, Exhibit J.  Actually, their

6    citation is wrong on their slide.  So if you refer back to

7    Exhibit K of the Taylor declaration, which was the research

8    report for Cronar® from 1991, I just submit they cannot and

9    they have not attempted to reconcile their misplaced

10   interpretation of this procurement record with what is clearly

11   described in Exhibit K that this support layer had the UV

12   absorber in it inside the PET along with the blue dye and that

13   that Tinuvin® 900 is in the PET support layer and that the UV

14   adhesive actually had nothing in it -- sorry, not the UV

15   adhesive, the adhesive had nothing in it.  There is no UV

16   absorber in the adhesive of this Cronar® 773x.  And if you

17   read Exhibit K closely, you'll actually notice that the reason

18   they made Cronar® 773x was to replace their first attempt,

19   which was to put the UV-absorbing compound in the adhesive

20   layer, and they found that that failed miserably, that there

21   were pin holes, and there were problems with it, and they

22   realized let's put it in the actual support layer.

23            THE COURT:  Stir it in there.

24            MR. ALLEN:  Exactly.  So that gets to my next point

25   on significant -- on their citation the one example in the

1    Exhibit K document about significant UV variability.  I don't

2    want to belabor on this point.  Mr. Ossola made it clear, and

3    if you read the entire record it is very evident that was one

4    manufacturing run at the very beginning.  They fixed it a

5    couple months later, and if you read through the whole

6    document there's several mentions of how this Tinuvin® 900 is

7    mixed uniformly, and there's even one that they want to really

8    highlight that the Tinuvin® 900 is dissolved in the polyester

9    melt, and "dissolved" is one of the words that's directly in

10   the uniformly distributed claim construction.

11          On Exhibit I their only argument here is pointing to

12   the -- this is Exhibit I to the Taylor declaration -- trying

13   to draw reasonable doubts about because the date that was

14   finally approved was February 8th, 1998 by management.  You'll

15   notice there's other dates on that document.  For example,

16   there's a writing completed of December 31st, 1997.

17          THE COURT:  It says, "period of development

18   February 1994 to November 1997" for the digital plates.

19          MR. ALLEN:  Exactly.  So it is our position focusing

20   on this date is not the appropriate way to come at this.  This

21   document is just a contemporaneous piece of evidence.  Whether

22   or not it is after the December 31st date or after the

23   March 11th this document on its face is showing that around

24   this time that this was the support -- this was how the 45 DPS

25   plate was manufactured, and they haven't cited to any

─────────── Motion - 4/16/13 ───────────

1    evidence.  They site what could have been different or they

2    haven't shown any evidence of how it was different, so based

3    on this evidence here it seems reasonable to assume that all

4    45 DPS plates were manufactured in the method -- or with the

5    structure that's depicted in Exhibit I, and then we have

6    30(b)(6) testimony that backs that up from both Dr. Shock and

7    Dr. Taylor and Dr. Taylor's declaration.

8         With regard to Gore to highlight a few things here, I

9    think Gore, clear reading of it, turns it as a very special

10   case where there were pains taken to keep this manufacturing

11   process secret.  Gore itself even acknowledges the Electric

12   Storage case that we rely on for why -- the use of a process

13   in the ordinary course of business to produce articles for

14   commercial purposes is a public use.  Gore on -- sorry, I'm

15   missing the page -- I think at 1548 states, "The non-secret

16   use of a claim process in the usual course of producing

17   articles for commercial purposes is a public use."  And it

18   cites Electric Storage for that.  So Gore doesn't change the

19   law at all.  And as Mr. Ossola shows you, there's a plethora

20   of evidence in the record showing that DuPont was not trying

21   to keep this process secret, that DuPont was making these

22   plates for printing customers, and the process was described

23   in brochures, operators' manuals.  There's no reason for

24   DuPont to try to keep it a secret because they're trying to

25   sell these plates to customers and have them do the process

— Motion - 4/16/13 —

1   themselves.

2        I missed one.  On point number 10 or reason for

3   denial number 10 just real quickly here, we're not relying on

4   that plate itself that Dr. Taylor found.  We're relying on the

5   support layer that was obtained from it, and to confirm that

6   that support layer was a reliable representative support layer

7   of the support layers that were used on these invalidating 45

8   DPS cells and on use -- public use exceptions that Dr.

9   Henderson took it off and he tested the UV absorbance, he

10  found it was within the spec.  So the support layer is just

11  corroborating other aspects of the evidence that we have

12  offered.

13       And then finally the last two points, I'll make these

14  as quick as possible.  Regarding the Taylor declaration, first

15  of all, Taylor is more than a credible witness.  They have

16  tried to imply that Dr. Taylor didn't know anything about the

17  45 DPS plates, that all he did was process these plates, but

18  if you look at Dr. Taylor's declaration -- this is in our

19  reply brief -- he did more than just process plates.  This was

20  specifically in Paragraphs 5 and 6 of his -- or Paragraph 6 of

21  Taylor's declaration.  He did things like support the

22  installation as to the CDI at customer facilities in the

23  United States and abroad, including the training of these

24  customers on the digital work flow.  It is just one example of

25  numerous ways that Dr. Taylor was more than just a technician

—— Motion - 4/16/13 ——

1   processing these plates.  He was actually involved in the

2   development and commercialization of these plates and had a

3   reason to know the structure of these plates, which is

4   evidenced by Exhibit H to the Taylor declaration where Dr.

5   Taylor is actually sent from Germany details on certain

6   batches of the 45 DPS plate that describe some of the

7   formulation characteristics.  So Dr. Taylor is clearly in a

8   position to know what the structure of the 45 DPS plate was.

9          And then the two pieces of evidence they tried to use

10  to discredit Dr. Taylor's testimony I would just like to

11  clarify for the record, and, most importantly, is Exhibit F to

12  the Taylor declaration, which is the sales record -- or the

13  sales brochure for the 45 DPS.  Exhibit F.

14         THE COURT:  The F that I have is it talks about the

15  plate, not the machine.

16         MR. ALLEN:  Yes, that's a brochure for 45 DPS, and

17  this is the exhibit that Mr. Horvack relied on to show that

18  there's no explanation of a back exposure step.  If you can go

19  to the Bates number 1109 and look at the table at the top, and

20  there's a column for image reproduction.

21         THE COURT:  It is a section.  It is not a column.

22         MR. ALLEN:  Section.  And there's an item labeled

23  "relief depth," and it says, "20 to 35 mil recommended

24  dependent on back exposure," so Exhibit F was teaching a back

25  exposure step.

—— Motion - 4/16/13 ——

1          THE COURT:  And this was to be read along with the

2   machine information, right?

3          MR. ALLEN:  Yes.  My understanding is this was just a

4   marketing brochure.

5          THE COURT:  Digital imaging systems, and are designed

6   for use with the Cyrel Digital Imager.  That's the half

7   million dollar machine.

8          MR. ALLEN:  Yes, Your Honor, that's correct.

9          THE COURT:  Then we have the instructions for that,

10  which is you back expose, as well as front expose, right?

11         MR. ALLEN:  Yes, Your Honor.  The Cyrel Digital

12  Imager is the special piece of equipment that you need to do

13  the digital work flow.  It does the laser ablation step, and

14  then you use the other equipment like the exposure banks;

15  those are used in both analog and digital, so you only have to

16  buy one new piece of equipment, but it was a half a million

17  dollars.

18         THE COURT:  That only does the laser ablation?

19         MR. ALLEN:  Yes, Your Honor, that's correct.

20         THE COURT:  I thought it was like the complete

21  washing machine; you know, it had a wash cycle, a spin cycle,

22  and a rinse cycle.

23         MR. ALLEN:  I'm sure somebody has tried to do

24  everything in one.  But, yes, it just does laser ablation.

25  And then they also tried to discredit Dr. Taylor's testimony

—————— Motion - 4/16/13 ——————

1    by relying on a couple examples in Exhibit G, which is that

2    very dense spread sheet that lists the processing details.

3    And they pointed to the Bates number 375389 and highlighted

4    that it was a 20-second back exposure for a presumably 45 DPS

5    plate.

6         Just two quick points.  If you look at the rest of that

7    record there's a thickness that's highlighted at .067 inches

8    right below.

9              THE COURT:  So it is not a plate at all?

10             MR. ALLEN:  It is actually just a typo.  The 45 DPS,

11   it should have said 67 DPS, and that can be confirmed by going

12   back to Exhibit H of Taylor's declaration.  It talks about

13   this batch and specifically describes it as a 67 thickness.

14             THE COURT:  Actually a 67, right?

15             MR. ALLEN:  Yes, Your Honor.

16             THE COURT:  DPS 67, what is it called?

17             MR. ALLEN:  67 DPS.

18             THE COURT:  All right.  Fine.

19             MR. ALLEN:  And then finally on Claim 27, I won't

20   belabor too many points here, but I just want to direct your

21   attention to our response to their statement of facts

22   concerning Dr. Shock's alleged copying of Dr. Kanga's work.  I

23   think you'll find there that if you were to read that that we

24   clearly show how they misrepresent Dr. Shock's testimony, take

25   snippets of this record and don't look at everything, and it

──────── Motion - 4/16/13 ────────

 1   is clear that Dr. Shock only turned to Melinex after he had

 2   already been working with Cronar®, that his program began by

 3   trying to improve upon Cronar®, and it came to Melinex later.

 4        And then as far as their alleged copying, their

 5   documents showing this copying dated 2000 and 2002.  The

 6   evidence we're relying on as far as Dr. Shock's conception of

 7   the idea to put a 5-mil UV-absorbing support layer on a

 8   67-gauge product, that document was written in 1998.  So how

 9   copying -- how Dr. Shock could copy an idea he formed in 1998

10   from evidence that's 2000 at best is unclear.

11        And I think that hits all of my points.  Do you have

12   any questions for me?

13             THE COURT:  No, not at this hour.

14             MR. ALLEN:  Thank you, Your Honor.

15             THE COURT:  Thank you very much, Mr. Allen.  Thank

16   you everybody.  I'm going to deny this motion for summary

17   judgment.  I do deny the motion for summary judgment.  DuPont

18   has adduced an array of documentation and some contemporaneous

19   testimony going to its claim that it had for sale and in use

20   the product and the method reflected in the '835 patent, but

21   DuPont's case on this issue -- because it has the burden of

22   proof by clear and convincing evidence on this issue even

23   though it is a defense -- DuPont's case rests upon inferences

24   that must be drawn from the documentation, and the inferences

25   are based partly on an appeal to logic and reason, partly upon

—————— Motion - 4/16/13 ——————

1    attorney argument, and largely upon testimony that they have

2    from persons with relevant knowledge, as well as one expert.

3         But the summary judgment standard is that you're

4    supposed to draw all the inferences -- all reasonable

5    inferences in favor of the non-moving party, and there are

6    enough reasonable inferences, maybe not all, but enough

7    reasonable inferences in favor of the non-moving party on this

8    very voluminous record of which I feel is only the tip of the

9    iceberg that I have seen that I think that it would be legally

10   inappropriate for this Court to grant summary judgment in

11   favor of DuPont on any of these claims based upon their

12   arguments presented at this motion primarily because it is

13   very difficult to say with assurance that no reasonable jury

14   could fail to find by clear and convincing evidence that the

15   support layer that was in the documented sales in 1997 and

16   1998 was the support layer that the documentation of DuPont

17   seems to indicate was a support layer that could satisfy the

18   claims that are asserted by MacDermid against DuPont in this

19   case.

20        I could go line by line by line, but I'm not going to.

21   If I were going to grant this motion for summary judgment,

22   that would be our task, but I have -- as you can tell I have

23   very, very carefully reviewed this record and your arguments

24   before you came here today.  I came armed with as much

25   comprehension as I could develop based upon the materials that

──────────── Motion - 4/16/13 ────────────

1   I had.  And I have listened carefully to the oral argument,

2   and I can envision what the summary judgment opinion would

3   look like, and I could not write one that would satisfy me or,

4   I think, an appeals court that giving all reasonable

5   inferences in the favor of the non-moving party no reasonable

6   jury could find by clear and convincing evidence, other than

7   that the product existed at that time.

8        So we will go forward to trial on this claim.  I am

9   specifically not addressing the Gore issue in this oral ruling

10  because I will have to see what the appropriate legal

11  instruction to the jury would be, and I will refine my legal

12  analysis on that -- what we have referred to as the Gore

13  issue, how much of a disclosure of your product do you have to

14  make in -- or is it method?  Whichever.  You have to make in

15  order to make it a public use.

16       And I'm also not going to address Claim 27 on the basis

17  of obviousness because obviousness is still in the case on the

18  broader picture as we have been told today, and since I can't

19  see my way clear to say that Claim 27, which is dependent is

20  barred by any ruling that I could make today on its

21  independent claim, Claim 24 then I don't think I have to get

22  to Claim 27 in ruling on this summary judgment motion today.

23       This has been very useful both in the preparation

24  that you've provided and in the arguments that you have

25  presented to the Court, and I just think that it's going to be

—————— Motion - 4/16/13 ——————

 1   quite interesting to see how we shape this for a jury and what

 2   they do with it.  And as I have already said, I am not one who

 3   grants a judgment as a matter of law in the middle of a trial.

 4   If need be, if either party demands that I set aside a verdict

 5   based upon your presentation of a full record at trial I will

 6   deal with it then, and I will deal with it line by line as

 7   necessary.

 8          Thank you all very much.

 9            MR. ROBINSON:  Does Your Honor want a formal order

10   presented?

11            THE COURT:  We'll do the order.  We'll just say for

12   the reasons stated on the record the motion is denied, and

13   that means, of course, it is denied without prejudice to being

14   renewed at trial.  Okay.  We're already more than ready to

15   quit for the day, but I would like you to talk to the

16   courtroom deputy off the record about how much time we might

17   need for the motion pending in the companion case by DuPont

18   against MacDermid with docket number 06-2383.  I had to

19   postpone oral argument that we had scheduled for last week,

20   and I only did it because of circumstances right here at

21   court, and I'll put you back on at your immediate early

22   convenience.  You don't have to worry about that.  We do need

23   to know how much time to set aside for it, and you can talk to

24   her about that.

25          Are we ready to adjourn for the day?

─────Motion - 4/16/13─────

1          MR. ROBINSON:  We are, indeed.

2          THE COURT:  Thank you all very much.  Take care.

3          (End of proceedings at 5:45 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25